No. 47,474

Leland C. Waechter, et al., *Appellees*, v. Amoco Production Company, Formerly Pan American Petroleum Corporation, *Appellant*.

(537 P. 2d 228)

Opinion filed June 14, 1975.

R. H. *Landt*, of Denver, Colo., and *Glenn D. Young, Jr.*, of Gott, Hope, Gott and Young, P. A., of Wichita, argued the cause and were on the briefs for the appellant.

*Dale M. Stucky*, of Fleeson, Gooing, Coulson and Kitch, of Wichita, argued the cause, and *John T. Conlee* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

Harman, C.: This is a declaratory judgment action commenced July 16, 1964, by Leland C. Waechter and approximately five hundred other named landowner-lessors, representing a class of some 3000 landowner-lessors, all in the Kansas Hugoton gas field,

involving two separate claims against Amoco Production Company, formerly Pan American Petroleum Corporation, formerly Stanolind Oil and Gas Company, as a result of gas taken by Amoco.

One claim is to determine whether Amoco as lessee under certain gas leases is obligated to account to the plaintiff-landowners for gas taken during the period June 23, 1961, to June 23, 1966, on the basis of 14.5¢ per thousand cubic feet at 14.65 pounds per square inch absolute instead of the lower prices actually paid to Amoco by the purchaser of the gas. The other claim is to determine whether Amoco is entitled to be repaid for overpayments of royalty it made to the plaintiff-landowners during the period from January 1, 1954, through December 22, 1957, pursuant to an 11¢ minimum price order of the Kansas corporation commission, and whether Amoco is obligated to account to certain plaintiffs who have already made refunds to Amoco. The trial court rendered judgment for plaintiffs upon all issues in the case, procedural and substantive, and defendant Amoco has appealed.

At the heart of this litigation, which has been a protracted three-sided battle over the years (between Amoco and the Cities Service Gas Company, purchaser of the gas, over price of gas on the one hand, and between Amoco and plaintiffs over royalties on the other) are two writings—the gas purchase contract between Amoco and Cities and the royalty clause in Amoco's leases with plaintiffs. Although, as will be seen later, there are actually forty-eight different forms of royalty clauses in the leases, in somewhat similar language, plaintiffs and Amoco are agreed the royalty clause covering most of the approximately 600,000 acres involved and also that upon which all parties will stand or fall, provides as follows:

"Lessee shall pay lessor monthly as royalty on gas marketed from each well one-eighth (⅛) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the market value thereof at the well."

The gas purchase contract dated June 23, 1950, under which Amoco sold the gas to Cities, contained these provisos:

"1. Buyer shall pay Seller for all gas purchased by it hereunder the price of 8.4 cents per 1,000 cubic feet until June 23, 1961.

"2. For all natural gas purchased by Buyer from and after June 22, 1961, the price of such gas shall be the fair and reasonable price for each successive five (5) year period thereafter based on and compared with the price for gas then being paid by other purchasers in the field under similar contracts and conditions, but in no event shall the price be less than 12 cents per 1,000 cubic feet."

The entire story of this litigation and the contentions of the parties pertinent to determination of this appeal may best be presented by quoting the trial court's findings of fact and conclusions of law, filed July 3, 1973, as follows:

"1. This suit was brought in the name of Leland C. Waechter and (approximately 500) other Plaintiffs named on Exhibit 'A' (attached to the original and amended petitions) individually on their own behalf, and also as representatives for and on behalf of the other members of the class of land-owners similarly situated owning lands (and minerals) subject to oil and gas leases owned and operated (in part) by Defendant, Amoco Production Company, formerly Pan American Petroleum Corporation, formerly Stanolind Oil and Gas Company, gas from which is delivered to Cities Service Gas Company under contract dated June 23, 1950.

"2. Plaintiffs ask for (1) a declaratory judgment decreeing that Amoco, and its successors in interest, account and pay royalty to the Plaintiffs at the rate of 14½ cents per Mcf at 14.65 psia for gas produced after June 23, 1961 to June 23, 1966, from said dedicated leasehold estate; and (2) for judgment decreeing that Defendant has no legally enforceable claim for a refund of royalties or any portion thereof paid by the Defendant to the Plaintiffs by reason of gas production prior to December 22, 1957, and ask for consequential accounting relief.

"3. Defendant contends that the U. S. Supreme Court has determined that the Federal Power Commission has and has assumed jurisdiction of gas, including the sale price thereof, which is sold and transported in interstate commerce, to the exclusion of all state agencies and courts, and that the prices which the producer, as a natural gas company, under the Natural Gas Act, is permitted to receive unconditionally and not subject to refund obligations or other contingent claims affords the exclusive basis upon which landowners' royalty should be computed.

"4. Defendant further contends that it has at all times relevant paid royalties provided for under the terms of the various leases based upon amounts received unconditionally and without refund obligation or contingent claims by the buyer as to such gas produced and sold to Cities Service which satisfies all contract obligations from the payment of royalties under the various terms set out in the many oil and gas leases dedicated to said gas purchase contract.

"5. On June 23, 1950, the Defendant at that time doing business under the name of Stanolind Oil and Gas Company, a Delaware Corparation, as seller, entered into a 'Gas Purchase Contract' with Cities Service Gas Company, a Delaware Corporation, as buyer conveying the natural gas produced from depths from the surface down to sea level (except certain liquifiable hydro-carbon from certain described leases) from oil and gas leases on approximately 600,000 acres of land located in the Kansas Hugoton Gas Field. Such contract, by its terms, superseded the previously existing contract dated June 13, 1946, between Defendant and Cities Service Gas Company, and under said contract Defendant undertook and agreed to make settlements for all royalties due and all payments to mineral and royalty owners and to make settlements with all persons having any interest in the gas covered by the contract.

"6. Buyer agreed to furnish all gas gathering and gas transportation pipe

lines and pay seller 8.4¢ per Mcf at 16.4 psia for the gas until June 23, 1961. Then the price was to be the fair and reasonable price for each successive five year period based on and compared with the price for gas being paid by other purchasers in the field under similar contracts and conditions, but in no event shall the price be less than *12¢* per Mcf.

"7. Stanolind Oil and Gas Company, as seller, dedicated to the fulfillment of said contract the gas to be produced from depths from surface down to sea level from gas leasehold estates located in the Kansas-Hugoton Gas Field which covered lands owned by the Plaintiffs herein, whether designed by name or as a descriptive class. Said contract reserved to Defendant the right to extract liquifiable hydrocarbons under the terms and conditions provided for in a processing agreement of the same date between the same parties. On the same date Defendant also sold to Cities Service Gas Company its gas pipeline gathering system connected to the wells.

"8. On December 2, 1953, the Kansas Corporation Commission issued the following order: 'That all persons, firms, or corporations which take gas or cause *gas to be taken from the Hugoton Gas Field in Kansas on and after January 1, 1954, at 12:01 A. M.*, shall, as a condition precedent to a withdrawal from the common source of supply, pay or attribute to all gas taken except gas for the operation of leases, for all purposes including payments to producers, land-owners, lease-owners and royalty owners, the fair and reasonable minimum price of not less than 11¢ Mcf (14.65 psia) at the well head until further order or orders of this Commission.' The 11¢ minimum price order of the Kansas Corporation Commission is still in force and effect and is enforced as to certain gas produced from the Kansas Hugoton Field, and has never been challenged or attacked as to the fact-finding that such gas had a minimum fair and reasonable value of 11¢ at the wellhead beginning on January 1, 1954.

"9. From January 1, 1954, through November 22, 1957, Cities Service Gas Company paid Pan American 11¢ per Mcf (14.65 psia). Pan American paid royalties on the same rate to the oil and gas lease royalty owners and transmitted payments at the same rate to its farmoutees mentioned in finding No. 13 below, for the period from January 1, 1954, through December 22, 1957.

"10. Cities Service Gas Company notified Defendant that it considered the 11¢ price order to be illegal and would demand a refund of the difference between said 11¢ per Mcf (14.65 psia) and 8.4¢ per Mcf (16.4 psia) if their contentions proved to be correct. Defendant then by letters dated February 19, 1954, notified 'all persons receiving gas settlements for Kansas Hugoton production from or through Stanolind Oil and Gas Co.' that settlements are being made on the basis of the K. C. C. order dated December 2, 1954, and in the event said order is held invalid, a refund be made to the purchaser of any amount so paid in excess of that payable in the absence of said Order . . . acceptance of checks computed on the basis of said Order will constitute your agreement to refund amounts paid you over and above the amount to which you would have been entitled. By letter, Defendant agreed to accept payments on the basis of the purchaser's letter first above mentioned.

"11. On June 7, 1954, the United States Supreme Court in the case of Phillips Petroleum Co. vs. Wisconsin, *et al.*, 347 US 672, held the sale and transportation of natural gas into interstate commerce is subject to 'The Federal

Natural Gas Act' and is subject to regulation by the Federal Power Commission exclusively.

"12. Defendant, as an independent producer of natural gas under the Natural Gas Act shortly after the Phillips decision, filed with the Federal Power Commission its rate schedule of 11¢ per Mcf at 14.65 psia and made application for a certificate of public convenience and necessity. The Federal Power Commission accepted said filing and issued such certificate.

"13. Defendant has assigned various gas rights under the leases dedicated to the Cities Service Gas purchase contract to approximately 168 owners and producers, who have made their own rate filings with, and made application for certificates of public convenience and necessity to the Federal Power Commission as independent producers and who are also referred to as farmoutees and whose interests cover approximately ¼ of the acreage dedicated to said gas purchase contract. Late in 1964, there were approximately 136 farmoutees and as of September, 1966, the number of such persons was approximately 96. The numbers have changed by reason of the reacquisition by Defendant of assigned interests under the terms of the farmout agreements and due to assignments by the farmoutees of their interests under such farmout agreements.

"14. Cities Service Gas Co. has at all times relevant herein paid the total purchase price, for gas purchased under said gas purchase contract to Defendant, which, in turn, used a portion of the funds to make royalty payments to the lessors and payments to the farmoutees for such gas, retaining the balance of such funds for its own account.

"15. There are approximately 975 gas wells located on 593,818 gas leasehold acres dedicated to the fulfillment of the gas purchase contract. The number of landowners varies from time to time. At the time of the last evidentiary hearing, there were about 2,000 to 3,000 of them. The identity of the royalty owners is ascertainable from Defendant's records for all relevant periods. The oil and gas leases are on 48 different forms, of which 34 are commercially printed forms, 3 are United States Department of the Interior, Bureau of Land Management forms, and 11 are individually typed forms. The leases cover lands in Stevens, Seward, Stanton, Grant, Haskell, Hamilton, Kearny, Morton and Finney Counties, Kansas.

"16. The assignments by Defendant to the farmoutees provide that such assignments 'shall in all respects, be subject to the following contracts affecting the lease acreage:

"'(a) A certain gas purchase contract dated the 23rd of June, 1950, by and between Stanolind Oil and Gas Company and Cities Service Gas Company.'

"Such assignments contained the following additional provisions:

"It is understood and agreed that to the extent of any conflict between the terms, covenants of this arrangement and conditions of this arrangement and the terms, covenants and conditions of the foregoing contract . . . the terms, and conditions of said contract shall govern and prevail.

"2. . . . the assignor hereby excepts and reserves unto itself, its successors and assigns, an overriding royalty of one-eighth of seven-eights (⅛ of ⅞) of all the gas produced and saved from all horizons from the surface to the base of the Hugoton Pay Zone. . . .

"3. (d) When, as to each well, . . . assignee shall have received

the aggregate gross sum of Fifty Thousand Dollars ($50,000.00) from the sale of his interest in the production from said well, assignor shall have the right and option, free of all cost, expense or other consideration, of exchanging its overriding royalty interest . . . for an undivided one-half (½) interest in the working interest . . . and an undivided one-half (½) interest in the tangible equipment. . . .

"7. In the event that the assignee receives a bonafide offer which he is willing to accept for the purchase of said lease acreage. . . . the assignee immediately shall give written notice thereof to the assignor . . . The assignor . . . shall have the prior and preferred right and option to purchase . . . the lease acreage. . . .

"8. In the event that the assignee should elect to surrender, let expire, abandon or release . . . said lease acreage . . . the assignee . . . if required to do so . . . shall reassign such rights . . . to the assignor.

"17. On December 8, 1956, the Kansas Supreme Court in the case of Cities Service Co. vs. The Kansas Corporation Commission, 180 K 454, upheld the 11¢ price order set by the K. C. C. and held that said well head order did not contravene the provisions of the Federal Natural Gas Act.

"18. On January 20, 1958, said Kansas Supreme Court decision was reversed by the United State Supreme Court in a per curiam opinion, 355 US 391.

"19. By letter dated February 20, 1958, Defendant notified 'all persons receiving gas settlements for Kansas Hugoton Production from or through Pan American Petroleum Co., formerly Stanolind Oil and Gas Company' that subsequent to the decision of the U. S. Supreme Court, on January 20, 1958, voiding the K. C. C. 11¢ price order, Cities Service Gas Company had discontinued payments to Defendant under said 11¢ order and had tendered as full contract payment on the reduced basis of the contract price, and had made demand for a refund of all over-payments made since January 1, 1954; that Defendant had not accepted the tender nor paid such demand but in turn would remit such payments as it received from Cities Service Gas Co. and Defendant's claim for refund against the interest owners will be held in abeyance pending final determination of Defendant's denied liability to Cities Service Gas Company.

"20. On April 11, 1959, in the case of Cities Service Gas Co. vs. The Kansas Corporation Commission, 184 K 540, the Kansas Supreme Court said they understood the per curiam opinion of the United States Supreme Court to hold that the State of Kansas had no jurisdiction to regulate the price of natural gas as it came out of the gas well since that price would affect interstate commerce and the jurisdiction of the Federal Power Commission. This was true even though the FPC had not at that time exercised jurisdiction.

"21. Then Cities Service filed suit against Pan American in the Superior Court of the State of Delaware in and for New Castle County, Civil Action No. 722 for said over-payments made under the KCC 11¢ price order. A decision therein upon a jurisdictional issue was appealed by Pan American to the Delaware Supreme Court and was affirmed by said Court, 158 A. 2d 478. Pan American filed a petition for and was granted certiorari by the United States Supreme Court, in the case of Pan American Petroleum Corporation vs.

Superior Court of Delaware, 366 US 656, which resulted in a decision affirming the Delaware Court.

"22. The trial in the Delaware Superior Court resulted in a judgment in favor of Cities Service Gas Co. against Pan American dated November 19, 1962, for $9,420,627.40 with 6% simple interest per annum from January 20, 1958. Cities Service agreed to accept 50% of the 6% interest due on said judgment, pursuant to a letter agreement under which Defendant agreed not to further contest or appeal the judgment and allow it to become final, in return for which Cities would assign to Defendant all of its assignable rights and claims against the farmoutees as to alleged overpayments during the period covered by the judgment.

"23. Shortly after the suit was filed in Delaware, Pan American instituted a declaratory judgment action against Cities Service Gas Company for construction of the terms of the 1950 contract in the District Court of Seward County, Kansas, (Case No. 7219). Cities Service removed this case to the United States District Court, District of Kansas, which Court on December 31, 1958, entered an opinion, 182 F. Supp. 439, remanding the case to the Seward County District Court. A procedural issue in this case reached the Kansas Supreme Court (185 K. 315).

"24. Upon final determination of the Delaware cases this case was dismissed by Pan American Petroleum Corporation.

"25. Under date of February 15, 1963, Defendant mailed letters to its individual royalty owners describing its litigation with Cities Service Gas Co. and made a request for a refund and set out in each letter the amount addressee owed and requested that the refund be paid in cash or that each landowner sign the letter, authorizing that 25% of the royalty due each month be withheld until said amount was recovered without interest. Defendant sent such letters to about 2,630 persons. Eighteen of the named Plaintiffs and between 200 and 250 class members, have paid Defendant without written protest in cash for such alleged overpayment of royalties. One hundred nine of the named Plaintiffs and several hundred other class members have signed the form letter to withhold 25% of current royalty payments until said overpayments are recovered, and Defendant has been and is so withholding, with 316 accounts paid in full by withholding as of July 22, 1966. That at the time said named Plaintiffs and other class members signed said form letters to withhold current royalty payment, no written protests were made by them. Ninety of the named Plaintiffs acquired their interests in the oil and gas leases after December 22, 1957, and Defendant has not claimed that these Plaintiffs are required to pay back Defendant any overpayments of royalty. One of the named Plaintiffs received payments based only on the price of 8.4¢ per Mcf for the period January 1, 1954, through December 22, 1957. Nine of the named Plaintiffs who acquired an interest after December 22, 1957, have not been billed by Defendant for such overpayments, such claims having been paid in full by said Plaintiffs' predecessors in interest. Forty of the named Plaintiffs acquired their interests from estates several years ago which are presumed closed. Sixteen of the named Plaintiffs were paid said overpayment, but Defendant has not claimed that said Plaintiffs pay back these amounts because of administrative reasons. Four of the named Plaintiffs are lessors under leases on farmout acreage. As of the time the last evidence was intro-

duced, there were between 2,500 and 3,000 royalty owners under oil and gas leases from which gas is sold to Cities Service Gas Company under the contract dated June 23, 1950. Defendant had filed claims for said overpayments against nine estates which were pending in various Probate Courts in the State of Kansas. Three other similar claims previously filed had [been] allowed by the Probate Courts and paid to Defendant, and such estates were either closed or in the process of closing. Seven other similar claims previously filed had been compromised and settled in full satisfaction thereof, and such estates were either closed or in the process of closing. Two hundred fifty-nine of its owners who were billed by Defendant for said overpayments had been deceased for several years and their estates presumed closed.

"26. On June 27, 1963, Pan American Petroleum Corporation filed suit in the Federal Court, District of Kansas, against Leland C. Waechter for $24,630.58 plus interest at 6% from November 28, 1962, alleging this represented Defendant's share, as royalty owner for overpayments made by Pan American, by virtue of the void K. C. C. 11¢ price order.

"27. Defendant Waechter filed his answer denying all liability and as affirmative defenses pled the statute of limitations, laches and acquiescence. Said action was dismissed without prejudice by Pan American on April 31, 1964.

"28. Commencing on December 9, 1963, Defendant withheld amounts over the price of 8.4¢ at 16.4 psia from each monthly royalty check until the alleged overpayments were or are recovered, except as to the following:

"(1) Royalty owners who paid cash refunds in response to Pan American's February 15, 1963 letter;

"(2) Royalty owners who signed written authorizations to withhold ¼ of monthly royalty payment to apply on refunds;

"(3) Royalty owners acquiring interests from estates now closed and thus barred by non-claim statute;

"(4) Royalty owners who acquired their interests after December 22, 1957, except in those instances where Defendant withheld because of alleged overpayment; and

"(5) Royalty owners whose overpayments amount to less than $25.00 from whom no refund was requested.

"29. In April, 1961, Pan American Petroleum Corporation filed a Declaratory Judgment Action against Cities Service Gas Company in District Court of Shawnee County, Kansas. On May 2, 1962, said Court held that a fair and reasonable price for gas sold under the contract involved herein for five years commencing June 23, 1961, based on and compared with the price for gas then being paid by other purchasers in the field under similar contracts and conditions is the sum of 14½¢ per Mcf at 14.65 psia. This judgment was affirmed by the Kansas Supreme Court, 191 K 511.

"30. On May 23, 1961, Defendant filed a Notice of Rate Change with the FPC requesting a rate of 12¢ per Mcf at 16.4 psia to be effective on June 23, 1961, as the guaranteed minimum under the contract. Cities filed a protest with the Commission alleging that Pan American's farmoutees holding interests in oil and gas leases subject to that contract should be included in Pan American's filing and that such persons should not be allowed to make

their own separate rate filings. In view of that protest the Commission issued an order dated June 22, 1961, which provided for a hearing and suspended the rate increase for one day until June 23, 1961, in Docket R161-532. Upon application for rehearing filed by Pan American, the Commission issued an order on August 4, 1961, terminating the suspension proceeding which would allow Pan American to collect the 12¢ rate as of June 24, 1961. However, Cities filed an application for rehearing on that order alleging that without suspension Cities would be unprotected because of its inability to compute payments to Pan American and the farmoutees. The Commission thereupon reopened the proceedings in Docket R161-532 on September 29, 1961, setting a hearing solely to determine the issue of coverage of these interests, leaving the 12¢ rate effective with no inquiry as to its reasonableness. The hearing before an examiner in Washington, D. C. commenced on November 15, 1961, and concluded February 7, 1962.

"On January 23, 1963, the examiner issued a decision stating that Pan American's rate filing should have included the interests of the farmoutees. This decision was reversed by the Commission's Opinion No. 391 on June 20, 1963. Cities filed an application for rehearing on this order which was denied by the Commission, and that order which established the validity of the 12¢ rate filings of Pan American and the farmoutees became final on or about October 15, 1963.

"Although the aforementioned Commission's order of September 29, 1961, which set the above-mentioned hearing, removed any obligation on Pan American's part to refund to Cities any part of the new 12¢ price, Cities insisted that it could not and would not pay Pan American that price without Pan American's assuming an obligation to refund such price, since Cities alleged that if the 12¢ filings of Pan American and the farmoutees were held to be invalid, Cities would have no right to recover monies paid at that price. Due to the question of whether Pan American's 12¢ filing might have covered just its own acreage, Cities also alleged that it could not pay the 12¢ price to Pan American or the farmoutees until the matter was resolved. On August 23, 1961, Pan American served a written demand upon Cities for the payment at the 12¢ price, but Cities continued to pay at the 8.4¢ price. Thereafter Pan American renewed its demand upon receipt of each monthly payment from Cities which was accepted only as a partial payment on account and without prejudice to the rights of Pan American and the other interest owners to collect the correct price.

"On March 25, 1963, Cities paid Pan American amounts attributable to the 12¢ price retroactive to June 24, 1961, with three percent interest subject to Pan American's agreeing to refund any amounts thereof which might be required in Docket No. R161-532. After the validity of the 12¢ rate filings was established on October 15, 1963, in the proceedings in Docket No. R161-532, on December 9, 1963, Pan American paid the 12¢ price and the interest retroactive to June 24, 1961, to approximately 1,800 royalty owners, including the royalty owners who had paid Pan American in cash for its claims for the overpayments of the 11¢ price and to the royalty owners who signed agreements providing for Pan American to withhold a portion of current royalty payments in satisfaction of such claims. Other royalty owners have been paid the 12¢ price as their overpayments are recovered in full. The

farmoutees in most instances also filed for the 12¢ rate; however, they commenced collecting that rate at dates different than the date of Defendant.

"Various others, but not all, of the 136 so-called 'farmoutees' filed for the same FPC rate increase and were allowed to collect it as of various dates.

"31. On June 12, 1962, Defendant filed with the FPC a Notice of Rate Change from 12¢ at 16.4 psia to 14½¢ per Mcf at 14.65 psia and attached a copy of the Journal Entry in the Shawnee County, Kansas, case reported in 191 K 511. Cities Service filed its protest to this increased rate because of the dispute in Docket No. R161-532.

"32. On July 12, 1962, the FPC suspended this increased rate until December 13, 1962, (five months) reciting that the proposed increase exceeded the applicable price ceiling.

"33. On December 10, 1962, Defendant filed with the FPC a motion to make effective the suspended rate of 14.5¢ and tendered a refund undertaking bearing 7% interest rate on any refund order.

"34. This was approved by the Commission, the bond was posted and by an order dated January 25, 1963, the increased rate of 14.5¢ per Mcf at 14.65 psia became effective as of December 13, 1962, subject to further orders of the FPC as to reasonableness. The farmoutees in some instances also filed for the 14½¢ rate and were collecting it under their bonds. However, their rates were effective on dates different than December 13, 1962. Some of the farmoutees had not filed to collect the 14.5¢ rate.

"35. Cities Service made such payments to Defendant for the gas delivered from December 13, 1962, to April 13, 1966, with payments commencing on November 5, 1963, after the Commission's Opinion No. 391 establishing the validity of the filings of Defendant and the farmoutees became final.

"36. Beginning December 9, 1963, and continuing until April 13, 1966, Defendant computed the landowners' royalties on the basis of 12¢ per Mcf at 16.4 psia and contended that until the FPC determined 14.5¢ per Mcf at 14.65 psia to be a fair and reasonable rate it could have been ordered to make refunds with interest at 7% per annum on its bond to Cities Service Gas Company.

"37. Defendant offered to pay royalty on a basis of 14.5¢ per Mcf at 14.65 psia to any of its inquiring royalty owners that would post a satisfactory corporate surety refunding bond carrying the same conditions of repayment as its bond to Cities Service Gas Company carried.

"38. Under date of April 13, 1966, the FPC issued an order approving a proposal settlement (and an amendment to the Gas Purchase Contract dated June 23, 1950) filed January 24, 1966, by Pan American Petroleum Corporation, which amendment provided that effective as of December 13, 1962, and continuing until June 23, 1971, Cities Service Gas Co. was obligated under the contract to pay for the gas received 12.5¢ per Mcf at 14.65 psia. This settlement resulted from a series of negotiations by Defendant aimed at arriving at agreed FPC rates for gas sold to various purchasers under 258 contracts (including the Cities Service contract of June 23, 1950), which it had on file with the FPC as a part of its various rate schedules.

"39. As a result of such FPC approval, Pan American has paid to any or all of its royalty owners under said contract (provided such payment will not prejudice its rights under this action) for gas it had produced during the time

between December 13, 1962, and April 31, 1966, the difference between the price of 12¢ per Mcf at 16.4 psia and 12.5¢ per Mcf at 14.65 psia, and since April 13, 1966, have continued to pay royalties at the rate of 12.5¢ per Mcf at 14.65 psia.

"The following interesting history of royalty payments over the entire period in question can be gleaned from the record and reveals the background leading to this litigation.

"With minor exceptions, Defendant paid royalties on an identical basis to all lessors by reason of production from January 1, 1954, until sometime in 1963, after it had sent its form letter of February 15, 1963. For gas produced during the period from January 1, 1954, through December 22, 1957, it accounted to the lessors for a proportional part of 11¢ per Mcf at 14.65 psia. In the case of the exceptions, it paid on the basis of 8.4¢ at 16.4 psia. For gas produced during the period from December 23, 1957, through October 22, 1963, it accounted to the lessors on the basis of 8.4¢ per Mcf at 16.4 psia.

"Under date of February 15, 1963, it mailed to a substantial number of its lessors its refund letter of that date, without distinction as to farmout acreage. The dollar amounts claimed in the various letters differed. The letter was mailed only to those from whom the company claimed refunds for alleged overpayments of royalty by reason of gas production between January 1, 1954, and December 22, 1957. The letter was not mailed to landowners from whom it claimed refunds of less than $25.00.

"What happened then depended on what the landowner did. If the landowner paid the amount demanded of him in cash, he was thereafter paid royalties on the basis of whatever current figure Defendant used in making royalty computations. Those persons from whom no refunds were demanded were paid on the same basis. On October 23, 1963, royalty began to be paid on a current basis to those lessors who had paid the demand in cash and to those from whom no refunds were requested based upon a price of 12¢ per Mcf at 16.4 psia with retroactive payment made December 9, 1963, up to 12¢ for the period June 24, 1961 through October 22, 1963, with interest at 3% from June 24, 1961, to March 24, 1963, and without interest thereafter.

"Those landowners who signed the February 15, 1963 form were paid three-fourths of the royalty to which they would have been entitled if the royalties had been computed on the basis of 12¢ per Mcf at 16.4 psia. The remaining one-fourth was withheld by Defendant and credited against the amount claimed to be due to it on the refunds. Where the form was neither signed nor a cash payment made, the lessors were paid royalty based on 8.4¢ per Mcf at 16.4 psia. Without notifying the landowner that it was doing so, (unless specific inquiry was made of Defendant), Defendant withheld the difference between that price and 12¢ per Mcf at 16.4 psia and credited the withheld sums against the claimed refund. When Defendant had recovered the full amount it claimed to be due from lessors, royalty payments were thereafter made on the basis of a fractional share of 12¢ per Mcf at 16.4 psia.

"This basis was used until about April, 1966. Beginning at that time, Pan American began paying royalties to those landowners from whom it no longer claimed refunds computed on the basis of 12.5¢ per Mcf at 14.65 psia (except as to some farmed-out leases). Pan American treated the named Plaintiffs differently than it did landowners who were not named Plaintiffs. As to the

landowners who were named Plaintiffs and from whom Pan American claimed no additional refunds, it paid royalties based on 12.5¢ per Mcf at 14.65 psia retroactive to December 13, 1962, without interest for the four-year period. As to those named Plaintiffs from whom Defendant still claimed refunds, it withheld from these retroactive payments the remaining balance (without crediting interest), which it claimed to be due on refunds and paid to the landowners the difference. As to some named Plaintiffs, the retroactive payment still did not equal the amount which Defendant claimed was owed to it, and in these cases, Defendant withheld the entire amount of the retroactive payment (without crediting interest), but continued to pay royalties after April, 1966, computed on the basis of 8.4¢ per Mcf at 16.4 psia. As to those named Plaintiffs who had signed the refund agreements, Defendant paid three-fourths of the amount of royalty computed, crediting the remaining one-fourth (without an interest credit) against the claimed refund until it had recovered the total amount claimed that such people owed them. After recovering the entire amount claimed (which did include interest), Defendant paid the full difference to the landowner. In some cases, even after withholding one-fourth of the retroactive payment, Defendant still claimed that a balance was due from the landowner to Defendant. After April, 1966, in such cases, it paid royalties on the basis of three-fourths of 12.5¢ per Mcf at 14.65 psia and credited the remaining one-fourth to the claimed refund until such time as it had succeeded in recovering the entire amount which it claimed to be due. Lessors who were not named Plaintiffs were paid these retroactive payments on May 26, 1967.

"Current royalties were at the end of the hearing, being paid to those landowners from whom Defendant did not claim further refunds, on the basis of 12.5¢ per Mcf at 14.65 psia. As to those computed from which Defendant still claimed a refund, Defendant was computing royalties on the basis of 8.4¢ per Mcf at 16.4 psia, or at three-fourths of 12.5¢ per Mcf at 14.65 psia (except as to some farmed out leases), depending on whether or not the letter of February 15, 1963, was signed.

"Defendant has taken the position that even though all of this gas is sold under terms of the June 23, 1950 contract, each of the farmoutees or its representatives must file its own rate schedule with the Federal Power Commission. It has been successful in this contention before the Federal Power Commission with the result that Cities Service was paying to Defendant for portions of the gas purchased under this contract at four different prices. Some of the so-called 'farmoutees' never filed for increased rates and were still receiving 8.4 cents per Mcf at 16.4 psia for gas produced from wells which they operate. As mentioned in these findings elsewhere, others filed only for the 12¢ price and Defendant was still receiving the 12¢ per Mcf at 16.4 psia. Others settled their own rate proceedings and Defendant was receiving the same rate which Defendant was receiving for its own gas. Defendant was still receiving, as to others, 14.5¢ per Mcf at 14.65 psia under bond.

"Where the farmoutees' rates were 8.4¢ per Mcf at 16.4 psia, Defendant was paying royalties to the landowners on that basis. As to these landowners, Defendant still claimed the right to recoup the full amount of the refund claims on February 15, 1963, although no amounts had as yet been withheld from current royalties. Where the farmoutees' rates were 12¢, royalties were

being paid to the landowners exactly as they were paid on gas from wells operated by Defendant itself prior to the approval of its 12.5¢ settlement price by the FPC. Where the farmoutees' rates were 12.5¢, royalties were being paid to landowners on exactly the same basis as on gas from acreage not farmed out. Where farmoutees' rates were 14.5¢ per Mcf at 14.65 psia under bond, Defendant was paying royalties to the landowners on the basis of 12¢ with all of the various credits and deductions described above, and holding the balance until such time as a final FPC rate was established for this gas.

"40. Defendant's 'Exhibit D' attached to the Colonkey affidavit of November 23, 1964, contains 48 different forms of gas or oil and gas leases which have been dedicated to the fulfillment of the gas purchase contract with Cities Service Gas Company (dated June 23, 1950). These exhibits contain variations in the gas royalty clauses, some of which are herein mentioned for the purpose of showing the extremes of such variations:

"(a) One-eighth of the proceeds when the gas is marketed off the leased premises or if not marketed off the leased premises then ⅛ of the market value at the well.

"(b) One-eighth of the proceeds from the sale of the gas—annual $100.00 shut-in clause—minimum price of 6¢ per Mcf—if gas sold for less than lessee to pay lessor the difference.

"(c) One-fourth of the proceeds of gas sold at the prevailing market rate but not less than 6¢ per Mcf—$200.00 a month shut-in clause.

"(d) One-fourth of the proceeds if sold at the well—if marketed off leased premises then ¼ of the market value at the well.

"(e) On gas sold off the leased premises or used by lessee—⅛ of the market value at the well—$80.00 a year shut-in clause.

"(f) For gas sold and used off leased premises the market value at the well ⅛ of the gas so sold or used—if sold at the well ⅛ of the amount realized from the sale.

"(g) One-eighth of the proceeds if sold at the well—if used off the premises ⅛ of the market value at the well but for no less than 4¢ per Mcf—if natural gasoline or liquid products extracted the market value of ⅛ of 60% of the volume extracted.

"(h) One-eighth of the gross proceeds at the prevailing market rate for gas used off the premises.

"(i) One-eighth of the proceeds from the sale of gas.

"(j) One-eighth of the net proceeds when gas used off the premises.

"(k) One-eighth of the net proceeds when gas used off the premises— payable quarterly.

"(l) 16⅔% of amount or value of gas and liquid products. (U. S. A.)

"41. Defendant made all payments of royalty and all claims and demands for refunds without any assumed, claimed or explained distinction between acreage not farmed out and that farmed out, and without reference to any variations in the terms of the various gas royalty provisions contained in the leases. None of the lessors were parties to, participated in, or were invited to participate in, the suits between Defendant and Cities Service Gas Company, the FPC proceedings above-mentioned, the settlement negotiations between Defendant and Cities Service Gas Company relating to or participants in, any agreement to refund any amount to Cities at any time.

"42. The June 23, 1950 gas purchase contract between Stanolind Oil and Gas Company (now Defendant Amoco Production Company) and Cities Service Gas Company superceded, previous gas purchase contract between the parties dated June 13, 1946. Under both contracts, Defendant had the right to process certain gas covered thereby for the recovery of natural gasoline (liquid or liquifiable hydrocarbons) before final delivery to Cities of the gas so processed.

"Under both contracts, the natural gas purchased and so processed was taken from the various wells to Defendant's processing plant located off the leased premises through a gathering system leading from the wells to Defendant's plant, and after the gas was so processed by Defendant, the residue thereof was delivered into Cities' mainline transmission system. Under both contracts, all of the gas so processed was and is used by lessee off the leased premises for the purpose of carrying on such processing in Defendant's plant for that purchase. Under the 1950 contract, every cubic foot of gas from the wells connected to Defendant's processing plant is sold, in part, by lessee off the leased premises. Defendant only has this right for gas from the A and B areas described in the contract dated June 23, 1950. Gas from C area is not processed by Defendant. The part so sold off the leased premises is the liquified hydrocarbon content thereof later recovered in the plant. Under both contracts, it is sold, after being removed from the processed wellhead streams, with the FPC having no jurisdiction over the sales price thereof.

"Royalties are paid by Defendant to the lessors by reason of the enhanced wellhead value of the produced streams, including those from farmed-out acreage, resulting from such processing operation. While no issue in this case relates to such additional incremental payments made to lessors because of such enhanced additional wellhead value by reason of the processing by the lessee of the gas off the leased premises, this does not change the fact that all of such processed wellhead production from A and B areas is used by the lessee off the leased premises and does not change the fact that each cubic foot of gas produced from the lands in these areas and so processed is sold, in part, by the lessee off the leased premises.

"In connection with the transition from the old contract to the new one, Defendant sold its gathering system connected to the various wells to Cities, by reason of which the gas mentioned now flows from the wells to Defendant's plant in gathering lines acquired by Cities for that purpose. After Defendant uses the gas in its plant for the processing operation, it is put into Cities' transmission lines, as under the old contract.

"Cities agreed to pay Defendant an indeterminate price for the gathering system, in monthly payments measured at the rate of six-tenths cent per Mcf for all gas purchased under the new contract until June 23, 1961, the payment, whatever it would amount to, to be considered as full and complete payment for the same.

"A portion of the gas sold under the June 23, 1950 gas purchase contract, consisting of that produced from the C area, is not so processed, and all of such gas is delivered into Cities' gathering system and sold to Cities at the wellhead under such contract, with no additional royalty payments being made to landowners by reason of liquifiable hydrocarbon content.

"Whether the gas from the leases involved herein was produced from farmed-out acreage or otherwise, and whether it was used off the leased premises for processing and sold, in part, in liquid form or sold in its entirety at the wellhead, and regardless of the differing royalty provisions of the leases involved, the amounts due by reason of monthly production in dispute in this case (whether paid or withheld) were computed by Defendant on the same per Mcf basis until Defendant began making differing computations for payments on farmed-out acreage based on differing FPC rate treatment of farmoutees.

[To understand better the sequence of events narrated in these findings we should at this point interpolate the following: On April 22, 1967, the trial court in this case mailed to the litigants copies of its tentative findings and conclusions, which would have resulted in judgment against defendant, and it set the date of May 23, 1967, for hearing objections to and arguments on the proposed findings and conclusions.]

"43. On May 11, 1967, Pan American Petroleum Corporation (sometimes hereinafter referred to as Pan American) filed a complaint with the F. P. C. against Plaintiffs herein which was docketed as *Pan American Petroleum Corporation v. Leland C. Waechter, et al.*, F. P. C. Docket No. R167-400. On June 23, 1967, this proceeding was consolidated with three other consolidated proceedings, namely *William Harvey Denman, Trustee, et al., v. J. M. Huber Corporation*, F. P. C. Docket No. R167-113, *Mobil Oil Corporation v. Carl F. Matzen, et al.*, F. P. C. Docket No. R167-114, and *Western Natural Gas Company v. Elmer Hennigh, et al.*, F. P. C. Docket No. R167-310.

"44. Prior to the time when Pan American filed its own complaint mentioned above, it had intervened in the last three proceedings mentioned above. Also participating as intervenors in these consolidated proceedings were Sinclair Oil and Gas Company (now Atlantic-Richfield Company), Shell Oil Company, Cities Service Oil Company, Columbian Fuel Corporation, Gulf Oil Corporation, Northern Natural Gas Company, Texaco, Inc., Cities Service Gas Company, Panhandle Eastern Pipeline Company, Colorado Interstate Gas Company, and many other oil and gas companies, pipeline companies and distributing, consuming and political groups.

"45. On May 17, 1967, one week prior to the last hearing in this matter, Pan American filed an injunction suit in the U. S. District Court for the District of Kansas against Leland C. Waechter and other named Defendants herein, together with ' . . . *all parties similarly situated* . . .' " (emphasis supplied), captioned *Pan American Petroleum Corporation v. Leland C. Waechter, et al.*, No. W-3842.

"46. In its complaint, Pan American was explicit in characterizing the named Plaintiffs herein as ' . . . representatives of a class of lessors and landowners to whom royalty is required to be paid under the terms and provisions of oil and gas leases,' gas from which is delivered under the above-mentioned June 23, 1950, Gas Purchase Contract.

"47. On May 25, 1967, Pan American secured federal court order enjoining Plaintiffs from proceeding further herein pending further proceedings before the F. P. C.

"48. Four similar complaints were filed against landowner-lessors by Mobil Oil Corporation, Western Natural Gas Company, Sinclair Oil and Gas Company, and Mapco Production Company.

"49. Extensive hearings were held before the F. P. C. examiner, all involving the parties herein, including pre-hearing conferences on May 9 and 10, 1967, and on July 25, 1967; evidentiary hearings were held before the examiner on January 22-25, 1968. Extensive evidence was presented and many briefs filed by the parties.

"50. On July 23, 1968, the presiding examiner issued his Initial Decision on Jurisdiction over Royalty Owners, which held that royalty owners were natural gas companies within the meaning of the Natural Gas Act and accordingly an increase in royalty rate paid would need to receive F. P. C. approval.

"51. Extensive briefs and responsive briefs on exceptions to the above report were presented to the F. P. C. by interested parties. Oral argument was presented on November 25, 1968.

"52. On July 23, 1969, the Commission, by a three to two majority, held that the royalty provisions of oil and gas leases constituted sales for resale of natural gas in interstate commerce subject to regulation by the F. P. C. under the Natural Gas Act. They further provided the manner of such regulation and regarding the amounts of payments retroactively to 1954.

"53. Judicial review proceedings were instituted by various parties from this F. P. C. opinion in various courts. Both Plaintiffs and Defendant herein filed judicial review proceedings. Eventually, all review proceedings were transferred to and consolidated in the United States Circuit Court of Appeals for the District of Columbia.

"54. On December 17, 1971, the Circuit Court of Appeals, in a unanimous decision, reversed the F. P. C. on the grounds that neither the statutory language nor congressional intent justified an attempt to extend the jurisdiction of the Commission to cover royalty interests. This decision is reported in *Mobil Oil Corporation v. Federal Power Commission*, 463 F. 2d 256 (1972).

"55. Various petitions for Writ of Certiorari were filed in the United States Supreme Court. Certiorari was denied on June 7, 1972, . . . U. S. . . ., 32 L. Ed. 2d 676. Defendant (now Amoco Production Company) together with others, filed petitions for rehearing which were finally denied October 10, 1972, . . . U. S. . . ., 34 L. Ed. 2d 116.

"56. On December 4, 1972, the U. S. District Court for the District of Kansas, pursuant to Plaintiffs' motion set aside its restraining order.

## "CONCLUSIONS OF LAW

### "Class Action

[The trial court here recited that procedural requirements for maintenance of a class action had been satisfied.]

### "Attorney Fees

[The trial court retained jurisdiction of the cause to make allowances for attorney fees.]

### "Motions by Defendant to Dismiss

[Here the trial court denied defendant's motion to dismiss which was based on four grounds: Plaintiffs' petition did not state a claim; that primary jurisdiction of the gas sold was vested in the FPC; plaintiff's petition did not state a controversy justiciable as a declaratory judgment action; and the failure of plaintiffs to join indispensable parties defendant, namely, defendant's farmoutees.

Because of the trial court's later reference to defendant's duties as lessee we quote a part of the court's conclusions stated in connection with its denial of defendant's motion to dismiss on the ground primary jurisdiction of gas sold was vested in the FPC, as follows:]

"13. Lessors have absolutely no say as to when, where, or how deep the wells are drilled, nor the size of the hole or pipeline, when or how much gas is produced, to whom it is sold, the price for which it is sold, where it is transported, how it is used, whether burned, stored, processed or recycled. Since lessees have the exclusive control of these matters surely this creates a relationship to lessors which requires the utmost good faith by lessees in all their dealings as to such gas because of lessees' opportunities, as a result of such exclusive controls, to take an unfair advantage of the lessors.

"The recorded opinions of the Courts in the United States have stayed away from the use of the term 'fiduciary' when describing the lessee relationship to the lessor as applied to gas leasehold estates. However, when the above listed rights contained in all the lease exhibits are construed, in connection with the many U. S. and Kansas statutes, Commission orders and Court decisions, the term 'fiduciary' is not an exaggeration but is an accurate as well as an appropriate description of the trust and confidence contemplated by good faith as well as a legal obligation.

"The decisions which construe the lessee relationship to the lessor as a 'debtor-creditor' relationship, have apparently, without exception, placed a strict but limited construction to the one paragraph pertaining to royalty payments of the gas lease rather than construing the gas leasehold estates as a whole, or to leases containing special clauses, inserted at the request of the lessors, pertaining to special royalty provisions.

### "Issue One

"23. Did the Defendant have on or subsequent to February 15, 1963, a legally enforcible claim against the landowners for a refund of royalties paid by Defendant by reason of the production of gas prior to December 22, 1957?

"24. Defendant in its answer as supplemented after the May 23 and 24, 1967 hearing, describes the following groups of named Plaintiffs who are in slightly different factual circumstances than the remainder of the named Plaintiffs on this issue. They consist of Plaintiffs who:

"(a) Were never paid any royalty by Defendant;

"(b) Paid cash refunds requested by Defendant;

"(c) Signed the authorization to withhold ¼ of monthly royalty payments to apply on refunds as requested by Defendant;

"(d) Acquired their interest from estates now closed, with claims barred by non-claim statute;

"(e) Acquired their interest after December 22, 1957;

"(f) Did not receive any alleged overpayments;

"(g) Allegedly owed amounts less than $25.00, with no refund requested of them.

"Therefore, so far as groups (a), (d), (e), (f) and (g) are concerned, this issue is moot as no claimed refunds were collected from such persons. However, insofar as those shown in groups (b) and (c) are concerned, the issue is not moot. As to named Plaintiffs and class members falling in such

groups, refunds were either made, or the letter dated February 15, 1963, or similar letters of later dates, were signed by such people and Defendant asserts that such action constitutes an accord and satisfaction.

"As of the date such demands were first made, on February 15, 1963, and before that time, Defendant had no legally enforceable claim to any such demands. This is particularly true since, in view of its duty to its lessors, it had an obligation to advise all persons upon whom it made demands, fully and fairly, as to the legal basis of such demands and as to possible legal defenses thereto.

"Having never had any legally enforceable right to such refunds and having failed to fully and fairly present the possible defenses to the Plaintiff-class, Defendant cannot rely upon the payments or upon the signatures as constituting an accord and satisfaction. As a legal matter there is no consideration for such an alleged accord and satisfaction.

"It hardly seems fair for Defendant to discriminate against its lessors who followed Defendant's advice and suggestions to its lessors' financial detriment by invoking against such lessors technical provisions of 20 year old gas leases pertaining to royalty payments. This is especially true when such technical provisions have been disregarded by the Defendant for all other purposes and thus invokes the doctrine of estoppel.

"25. None of the named Plaintiffs (except those listed in groups (b) and (c) Defendant's 'Exhibit A' as amended) insofar as disclosed by the evidence, expressly consented or agreed to Defendant's letter dated February 19, 1954 (Finding No. 10) nor Defendant's letter dated February 20, 1958 (Finding No. 19) nor to letter dated February 15, 1963 (Finding No. 25). To the contrary, some of the Plaintiffs informed the Defendant of their disapproval by letters, special endorsements on the royalty checks, and both oral and written notices through the Southwest Kansas Royalty Owners Association. The Plaintiff Waechter even resisted suit for such refunds.

"26. Because of the duty owed by the Defendant, to all its royalty owners, implied consent cannot properly be inferred by any inaction on the part of any of the named Plaintiffs nor by the deposit of royalty checks containing unlimited endorsements.

"27. Therefore, the same having been properly pled, the Statute of Limitations as to written contracts applies since more than five years elapsed between December 22, 1957, and Defendant's withholding of royalties which started December 9, 1963.

"28. The 11¢ payment was a voluntary payment and Defendant never had a valid claim for such refunds. There was no consideration for cash repayments made or for agreements to refund made by lessors, and Defendant is estopped to deny that the 11¢ payments were proper payments.

"29. It is therefore ordered that the Defendant account to the named Plaintiffs and class members from whom such purported refunds were received or retained for the account thereof together with interest on the amount of each of said payments or retentions from the date any such sum was received or retained to the date repayment to Plaintiffs and class members is finally made, with interest to be computed at the legal rate from time to time.

## "Issue Two

"30. Is the lessee-producer obligated to account to the landowners for royalties computed on the basis of not less than 14.5¢ per Mcf at 14.65 psia for the gas produced, delivered and transported in interstate commerce and sold to Cities Service Gas Company during the period from June 23, 1961, through June 23, 1966?

"31. Defendants, in the proper exercise of its duties to its royalty owners, procured an adjudication as to the value of its gas for the five year period commencing June 23, 1961. Pan American Petroleum Company vs. Cities Service Gas Company, 191 K 511. This judgment has not been reversed nor modified. Even though the F. P. C. might have primary jurisdiction over leasehold royalty value (which this Court does not think it has) it certainly does not have appellate jurisdiction over the Kansas Supreme Court to make a binding adjudication changing the Kansas Supreme Court adjudicated value of gas for the 5 year period commencing June 23, 1961.

"32. After the 14½¢ judgment became final the matter became a collection matter. This was not changed by the fact that Cities Service Gas Company resisted collection and F. P. C. approval was delayed.

"33. Pan American Petroleum Company had the right and authority to compromise this judgment as a collection settlement insofar as it affected its own interests, but without the consent of its royalty owners it breached its duty to its royalty owners. No doubt the Defendant calculated a settlement of the judgment on the basis made was financially more profitable to itself than would be a continued struggle with Cities Service Gas Company and an overburdened F. P. C. This is probably true though speculative. However, it is obvious that this settlement is not financially beneficial to the Defendant's royalty owners. This is not contradictory to the case of Matzen v. Hugoton Production Company, 182 K. 456, but is in harmony therewith.

"34. Defendant alleges that this cannot be a class action because of the variations in the royalty clauses of the various leases. In contesting the Court's jurisdiction, it alleges the F. P. C. has jurisdiction to set the royalty price for all the gas going into interstate commerce by virtue of the Cities Service contract. This creates a contradiction since the Defendant for jurisdictional purposes contends that the price is set or must be set by the F. P. C. This means that the price is based per Mcf upon the value of intermingled gas going into interstate commerce by virtue of the Cities Service contract and wholly disregards the alleged price variations of the individual leases. Neither does Defendant's payment of royalties recognize the individual lease variations. For the Defendant to contend otherwise—since Defendant receives the same price for the gas regardless of its origin as between the individual lessors herein—is to profit at the expenses of its lessors.

"35. The intention of the parties to all of these leases was that royalties should be computed on the basis of the fair and reasonable market value of natural gas, whether such gas was sold at the wellhead or off the leased premises, and all of the lease provisions in controversy here provide in substance and legal effect that all royalties will be computed on such basis.

"36. Defendant has by its conduct through the years, and by its arguments here, recognized that all of the various lease provisions in question here are identical and place upon the Defendant the identical legal obligation

as to the payment of royalties, and it cannot now contend that the various different lease provisions have a different legal effect.

"37. It is therefore ordered that the Defendant account to each of the named Plaintiffs and class members for gas taken on the basis of 14½¢ per Mcf at 14.65 psia for the period of time commencing June 23, 1961, through June 22, 1966, with interest at the legal rate prevailing from time to time on the difference between the amount owed (according to this judgment) and the amount paid.

"38. The parties are agreed that the controversy does not include the question of the value of liquified hydrocarbon content of the gas removed by Defendant in liquid form (on which royalties have been separately paid and about which there is no dispute herein) and that it does not include the question of Plaintiff's entitlement to royalty by reason of the helium content of the gas (which is the subject of wholly separate litigation between the parties and others in a case pending in the Federal District Court of Kansas), the 14½¢ figure does not include royalty paid by reason of such removal of liquids, nor royalty to be paid, if any, by reason of helium content."

The trial court entered judgment for plaintiffs and against defendant as set out in the foregoing conclusions and defendant now appeals.

Upon appeal appellant Amoco renews its objections made at trial level, both procedural and substantive; however, we go directly to consideration of each of the two claims upon its merits.

We treat first with that denominated by the trial court as *Issue Two*—whether appellant must account to the landowners for gas taken by it during the period June 23, 1961, to June 23, 1966, on the basis of 14.5¢ per mcf instead of on the basis of lower prices actually received by appellant from Cities, purchaser of the gas. The facts are undisputed. Under the 1950 sales contract Cities was to pay appellant 8.4¢ per mcf at 16.4 psi for gas until June 23, 1961. Then the price for each successive five year period was to be a fair and reasonable one based upon like sales in the field but in no event less than 12¢ per mcf. Negotiations between Cities and appellant prior to June 23, 1961, failed to result in an agreed price, whereupon appellant filed the declaratory judgment action in Shawnee county seeking determination of a price based on other contracts. In this action appellant contended the price should be 19¢ per mcf at 14.65 psi while Cities said it should be 12¢ per mcf at 16.4 psi (this latter figure would translate to 10.7195¢ at 14.65 psi, there having been a pressure base reduction in the field during the interval). Appellant also filed with the FPC a rate schedule of 12¢, the guaranteed minimum under the 1950 contract, reserving the right to file for any increase the Shawnee county court might allow. Cities pro-

tested this filing in several ways; however, the FPC permitted the 12¢ rate to remain effective but made no inquiry as to its reasonableness.

On May 2, 1962, the Shawnee county district court held that the reasonable price under the 1950 contract for the five year period commencing June 23, 1961, was 14.5¢ per mcf at 14.65 psi, which decision was affirmed in *Pan American Petroleum Corporation v. Cities Service Gas Co.*, 191 Kan. 511, 382 P. 2d 645. On June 12, 1962, appellant filed with the FPC notice of rate change from 12¢ at 16.4 psi to 14.5¢ per mcf at 14.65 psi. Cities again protested, citing the ongoing hearings on the 12¢ rate. After more hearings and litigation, Cities and appellant entered into an agreement settling their disputes over a group of 258 gas purchase contracts, whereby effective December 13, 1962, and continuing until June 23, 1971, Cities was obligated to pay under the contract in question 12.5¢ per mcf at 14.65 psi. The FPC approved this settlement. The net result of all the foregoing was that during the period in question appellant received from Cities payment for gas at the rate of both 12¢ and 12.5¢ and it has paid royalty to appellees on that basis; for a time appellant did receive payment at the higher rate of 14.5¢ but it had to make refund of payments so made. Appellant has paid its royalty owners their one-eighth part of the amount actually received by it from Cities.

Under the leases appellees' royalty was "one-eighth (⅛) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the market value thereof at the well". In its finding of fact No. 42 the trial court pointed out that under the gas purchase contract with Cities appellant had the right to process gas taken from wells located in areas designated A and B for the recovery of natural gasoline, for which a royalty was separately paid; that appellant did so by taking gas to its processing plant which was "off the leased premises" and from this it concluded as a fact that the sale to Cities occurred "off the leased premises", which would make "market value" the measure for royalty. The trial court acknowledged that gas taken from area C was not so processed but made no differentiation as to it in this regard. This court has twice heretofore had occasion to discuss the point of delivery and sale of gas sold by appellant to Cities under the identical purchase contract involved here. In *Stanolind Oil & Gas Co. v. Cities Service Gas Co.*, 178 Kan. 202, 284 P. 2d 608, the court construed the contractual arrangement between the parties and said:

"Under the Gas Purchase Contract the point of delivery was at the well-heads. . . . [p. 204]

". . . This [Gas Purchase Contract] reserved to Stanolind the right to process and extract gasoline and other liquefiable hydrocarbons from the raw gas thus sold by Stanolind to Cities, in accordance with the provisions of the Gas Processing Agreement. This last-mentioned instrument provided that, subject to the reservation to Stanolind with respect to the liquid and liquefiable hydrocarbons, Cities at all times was the owner of all the gas delivered by Cities to Stanolind at the latter's processing plant. . . . [p. 205]

". . . Taking the contracts and construing them as a whole, it seems clear that the 'exceptions and reservations' in question mean that Stanolind reserved the right to process the gas that it sold to Cities. From the over-all picture and taking all of the provisions of the instruments into consideration, it is clear that the entire arrangement was one whereby Stanolind sold its gathering system to Cities, Cities purchased all gas delivered to it by Stanolind at the well-heads, and then in turn transported the raw gas to Stanolind's processing plant, at which point Stanolind, under rights reserved to it in the contracts, processed and extracted gasoline and other liquefiable hydrocarbons from such quantity of gas as it desired, and for which is obligated itself to pay Cities, and then released to Cities such gas as remained, and which such residue gas was satisfactory for Cities' purposes [p. 206]".

Upon a second appearance here of the same case (181 Kan. 526, 313 P. 2d 279) this court reexamined the foregoing findings, on which judgment had been rendered upon appeal, and adhered to both the findings and the judgment. Consequently, in the case at bar it must be held the trial court erred in its finding that the gas was sold "off the leased premises". Instead it was sold at the well, title there passed to Cities with appellant having only a right to process some of the gas covered by the contract.

In ruling against appellant the trial court also made reference to appellant's duties to its royalty owners, both in connection with its declaratory judgment action against Cities in Shawnee county and in later settling with Cities on a lower basis after FPC approval could not be had on the 14.5¢ rate. Apparently the trial court had in mind the duty of a fiduciary mentioned in its conclusion 13, already quoted. We know of no precedent to the effect stated therein nor of any reason why an oil and gas lessee should be declared a fiduciary. It seems well established that a lessee under an oil and gas lease is not a fiduciary to his lessor; his duty is to act honestly and fairly under a contractual relationship (*Bunger v. Rogers*, 188 Okla. 620, 112 P. 2d 361). Here there was no charge of bad faith or collusion made against appellant; in fact appellees expressly concede in their brief they have never contended ap-

pellant exercised bad faith or was guilty of fraud or dishonesty in connection with their company-wide settlement with Cities which was later approved by the FPC. There is no indication appellees' rights were in any way sacrificed in that settlement. The record reveals sustained efforts by appellant to secure a price greater than the minimum of 12¢ fixed in the purchase contract for the period in question and there is nothing to suggest it did not use the utmost diligence to obtain the best price possible.

The issue really boils down to the parties' intent in entering into the leases in question. In the royalty clauses they used the term "proceeds" and the term "market value". Appellees contend that when the royalty clause is considered as a whole it is clear the parties intended those terms to be synonymous—that they meant the same thing in terms of money. They say in the case of arms-length unregulated wellhead sale the market value of the gas would naturally equal the proceeds from a wellhead sale. They further say that the 14.5¢ price fixed in the Shawnee county case is "the best evidence of the market value or price for the gas for the period in question and would result in the 'proceeds' contemplated by the parties, where mentioned in the lease". There are difficulties in appellees' position.

The sales of gas were not unregulated. Sales of natural gas in interstate commerce became subject to federal regulation by virtue of the National Gas Act of 1938; however, the FPC did not assume jurisdiction over the pricing of natural gas at the wellhead in the Hugoton field until in 1954 (see *Cities Service Gas Co. v. State Corporation Commission*, 184 Kan. 540, 337 P. 2d 640). Prior to that time there had been a measure of state regulation. Most of the leases contained a clause that both the lessor and lessee contemplated and agreed that the lease in all respects should be subject to valid orders of any duly constituted authority having jurisdiction of the subject matter of the lease. Even without such language in a lease private contracts are subject to the laws of the land (*Home Bldg. & L. Assn. v. Blaisdell*, 290 U. S. 398, 78 L. Ed. 413, 54 S. Ct. 231). Appellees never were able to maintain the 14.5¢ price obtained by them in the Shawnee county case. In our opinion of affirmance of that court's order we pointed out that what the lessee was attempting to do was to have fixed a fair and reasonable price for gas under the contract which could be submitted to the FPC for its approval or rejection. It was further stated the lessee could not have a finding or conclusion made in the case which would form

the basis of a money judgment; the most the lessee could accomplish was determination of the contract price, which would then be submitted to the FPC for its approval or rejection; the price would have to be so approved before there could be any basis for a money judgment (*Pan American Petroleum Corporation v. Cities Service Gas Co.*, supra).

Nor can we say the parties used the term "proceeds" and "market value" as equivalents in the royalty clauses. They were not used interchangeably. The term "proceeds" was used only in context with the phrase "if sold at the well", while the term "market value" was used in the alternative phrase "or, if marketed by lessee off the leased premises". Proceeds ordinarily refer to the money obtained by an actual sale. This connotation is not without significance in the gas business. Where the sale is at the wellhead the lessor does not consent to the uncertainties of what the market or fair value or price of the gas may be—he is willing to take what the lessee sells it for, relying on the lessee's self-interest in obtaining the best price possible. Under the usual lease for every dollar the lessor receives the lessee receives seven. Where sale is off the leased premises market value at the well comes into play in determining royalty but other factors also may play a part in determining the parties' intention, such as items of expense away from the wellhead, other sales and the like, in determining just what that market value is. In such situation there is no real sale at the wellhead from which proceeds are derived. Contrariwise, where gas is sold at the wellhead there are "proceeds" of that sale—the amount received by the seller from the purchaser.

Appellees make the further argument that if the intent of the parties is not clear that proceeds and market value or price mean the same thing, then under the rules of construction of ambiguous contracts the same result should be reached—appellant and its predecessors having prepared the lease it is to be construed most strongly against appellant and in favor of the lessor. The difficulty is, the intent of the parties seems clear from the language used in the contract and there is no room for construction as urged. Nor do we see anything extrinsic in the case negativing the parties' clearly expressed intent. They agreed the royalty should be one-eighth of the proceeds if sold at the well. We cannot make a new contract. Appellees have been paid their share of those proceeds and the trial court erred in holding appellant liable for more.

We turn now to the other claim, appellant's entitlement to be re-

paid for overpayments of royalty made to its lessors during the period January 1, 1954, through December 22, 1957, pursuant to KCC's 11¢ minimum price order, and its obligation to account to those lessors who have already made refunds to it.

On December 2, 1953, the KCC promulgated an order effective January 1, 1954, fixing a minimum price of not less than 11¢ per mcf at 14.65 psi to be paid for gas taken from the Kansas Hugoton field. Cities, which had been buying the gas in question at 8.4¢ at 16.4 psi (equivalent to 7.5036¢ at 14.65 psi) pursuant to its contract with appellant, considered the KCC order to be invalid and notified appellant judicial review of the order would be sought but payments would be made in compliance with the order subject to refund in event it was nullified. February 19, 1954, appellant notified its royalty owners of Cities' position. The notice further stated acceptance of the royalty checks would constitute an agreement by lessors to refund any possible overpayments. From January 1, 1954, through December 22, 1957, the KCC 11¢ rate was the basis for computation of royalty payments.

June 7, 1954, the United States Supreme Court held the sale and transportation of natural gas into interstate commerce was subject to FPC regulation (*Phillips Petroleum Co. v. Wisconsin*, 347 U. S. 672, 98 L. Ed. 1035, 74 S. Ct. 794). Shortly thereafter appellant filed its 11¢ rate schedule with the FPC and received a certificate of public convenience and necessity. Meanwhile Cities took the KCC minimum price order through judicial channels and on January 20, 1958, secured its invalidation (*Cities Service v. State Comm'n.*, 355 U. S. 391, 2 L. Ed. 2d 355, 78 S. Ct. 381). The order was held void *ab initio* (*Cities Service Gas Co. v. State Corporation Commission*, 184 Kan. 540, 337 P. 2d 640). February 20, 1958, appellant notified its royalty owners that Cities had demanded refund but that it had denied liability and its claim against the royalty owners for refund would be held in abeyance pending final determination of its liability to Cities. Cities instituted litigation to recover the overpayments while appellant filed in a different forum a declaratory judgment action for construction of the contract. Eventually, on November 20, 1962, this litigation culminated in a Delaware superior court judgment against appellant for nearly ten million dollars plus six percent interest. Appellant then settled this litigation in an agreement with Cities whereby Cities agreed to remit half the interest and appellant agreed not to contest the

judgment further. February 15, 1963, appellant sent form letters to its lessors detailing the litigation and settlement. It requested cash refund of the overpayments or in the alternative that the lessor sign an authorization that 25% of the current royalty due each month be withheld until the overpayment was recovered. Some royalty owners paid the full amount of refund requested, others signed the requested authorization for deductions and some did nothing. As to some of these latter, appellant, without notice initially as to what it was doing, began making the deductions as though the royalty owners had signed the authorization. As to the remainder appellant made no claim for one reason or another—transfer of interest, death, final closure of estates, claims less than $25.00, etc. Appellant's letters requesting refunds prompted a number of royalty owners to make inquiry of the Southwest Royalty Owners Association, a nonprofit organization, which led to formation of a group known as the Pan American Committee to investigate the legal position. Eventually the committee mailed to appellant's lessors agreement forms to take part in this class action against appellant.

As to this claim for relief (*Issue One*) the trial court held generally that appellant had no legally enforceable claim to such demands; that in view of appellant's duties to its lessors, it should have advised as to the legal basis of the demands and as to possible legal defenses thereto; there was no accord and satisfaction for the foregoing reasons and for lack of consideration; that in some manner appellant was estopped from making the demands; some lessors did not expressly agree to make the refunds; that the five year statute of limitations as to written contracts applied because more than five years elapsed between December 22, 1957, and appellant's withholding of royalties starting December 9, 1963; the 11¢ payment was a voluntary payment; there was no consideration for cash repayment or agreement to refund, and appellant was estopped to deny the 11¢ payments were proper payments.

Appellees make no argument in support of the trial court's ruling on the theory of estoppel and we do not see how the ruling can be upheld on that ground. Appellant fully advised its royalty owners of the situation respecting the claimed invalidity of the KCC order and the possibility refunds might have to be made. There was no misrepresentation or consequent detrimental change of position. The elements of estoppel were lacking (see *Place v. Place,* 207 Kan. 734, Syl. ¶ 4, 486 P. 2d 1354). Nor can the payments of the 11¢ price be said to be voluntary. Appellant was under compul-

sion of a business hazard in making them. The KCC order compelled it to pay the 11¢ minimum price "as a condition precedent for withdrawal from the common source of supply". If it failed to comply with the commission order it was subject to criminal penalty under K. S. A. 55-708 and civil penalty under 55-710. The point was considered in *Cities Service Gas Co. v. United Producing Co.,* 212 F. Supp. 116 (ND, Okla., 1960) albeit in another context. It was held that payments made under the compulsion of the KCC minimum price order, accompanied by protest and request for refund if the order were invalidated, were involuntary.

The trial court also found no contractual obligation existed whereby any of the royalty owners were bound to refund the overpayment. Although we do not regard it, standing alone, as necessarily dispositive of the particular class of royalty owners involved we note that in *Landon v. Northern Natural Gas Company,* 338 F. 2d 17 (CA 10, 1964), a dispute between a producer and a purchaser of gas where letters were sent stating that increased payments by reason of the KCC minimum price order were made under protest subject to refund if the order were invalidated, and the checks sent referred to the letters, it was held that the letters together with acceptance and endorsement of the checks constituted a refund contract.

The real basis relied upon by appellant for its right to have the overpayments refunded, and we think properly so, is stated in 3 Williams, Oil and Gas Law, § 657, as follows:

"*Lessee's Remedy in Event of Overpayment of Royalty*

"Where as a result of good faith mistake royalty has been paid to a person not entitled to receive same or where excessive payments have been made in good faith, it is generally held that the lessee (or purchaser) who has made such payments may recover from the payee the payments to which he was not entitled. However a voluntary overpayment not caused by mistake may not be recovered." (p. 712.)

And in 3 Kuntz, Oil and Gas (A Revision of Thornton) § 42.8, the following is found:

"*Effect of mistake in payment of royalty.*

(a) Right of lessee to refund of royalty erroneously paid.

"If the lessee or the purchaser of royalty oil or royalty gas should overpay a lessor or should make payment to a person not entitled to receive such payment, such lessee or purchaser may or may not be entitled to a refund of the amount erroneously paid, depending upon the circumstances of the payment.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Ordinarily, if a person who has full knowledge of the facts makes a voluntary payment to another who claims a right to such payment, there is no en-

forceable right to a refund of the amount so paid even though there was no legal liability to make the payment in the first instance. Accordingly, in the absence of special circumstances, the lessee is not entitled to a refund if he or the purchaser of oil makes a voluntary overpayment of royalty to the lessor.

"The lessee may, however, recover from the lessor any overpayment of royalty which he made because of mistake of law or fact. A payment by mistake is not a 'voluntary' payment, and it may be recovered even though the payor was negligent in making the payment.

. . . . . . . . . . .

"It might also be observed that a payment is not 'voluntary' if it is made under duress. . . ." (pp. 405-407.)

The philosophy in the foregoing was the premise for the court's ultimate ruling in *Panhandle Eastern Pipe Line Company v. Brecheisen*, 323 F. 2d 79 (CA 10, 1963). There a purchaser of gas produced in the Kansas Hugoton field sought to recover amounts it had paid to lessor pursuant to a KCC minimum price order greater than that in the gas purchase contract, which order was later invalidated in the federal supreme court. In determining which statute of limitations was applicable to the claim, the court said:

"Although a written contract was in existence between the lessor and the lessee and another between the lessee and the distributor of the gas, the amounts here claimed are not due under either contract. The sole basis for recovery must be found in a contract implied in law requiring a person who has been unjustly enriched at the expense of another to make restitution. The suit does not seek to enforce a provision of any contract and the price provisions of the contract are in evidence merely to demonstrate the proper difference between the price agreed upon and the price forced upon the buyers by the invalid order of the Kansas commission. . . .

"We hold that the trial court correctly determined that Panhandle's claim was not based upon a writing and is thus limited to an action for unjust enrichment or other aspects of implied contract. . . ." (p. 82.)

We have already indicated the royalty payments to the lessors based upon 11¢ per mcf were not voluntary in that they were mandated by the KCC. The fact appellant benefited as well in its producer capacity does not alter the character of its payment to its lessors. The minimum price order was held to be a complete nullity and void *ab initio*. Such an order cannot alter a valid contract rate. Under the contract and all the circumstances here appellees had no right to retain any amount above the 8.4¢ rate.

A more serious question is presented with respect to the application of the statute of limitations to these claims, bearing in mind there are three classes of lessors: Those who made immediate cash refunds as requested, those who signed authorizations for deductions and who may or may not have made full restitution, and those who

did nothing but who nonetheless had deductions made by appellant from current royalties. In its conclusion No. 27 the trial court stated that the statute of limitations, having been properly pled, applied to appellant's claim for entitlement to refund. Our search of the record on appeal reveals no mention of the statute of limitations in any of appellees' several pleadings but assuming it was brought into the case it is difficult to see the application made. Appellant was not in this action claiming a lump sum money judgment against any lessor by reason of the overpayment. Appellant sought to do that when on June 27, 1963, it filed suit in federal district court in Kansas against appellee Leland C. Waechter. Waechter's answer, among other things, pled the statute of limitations (findings 26 and 27). On September 30, 1963, the decision in *Panhandle Eastern Pipe Line Company v. Brecheisen,* supra, was filed. It held that any cause of action for repayment of royalty made by virtue of the KCC minimum price order accrued January 20, 1958, the date of the federal supreme court's decision voiding the order and further, as already pointed out, that the three year statute of limitation for unjust enrichment was applicable. Accordingly, such claims for refunds became outlawed January 20, 1961 (this may well have been the reason for appellant's dismissal in April, 1964, of its federal court suit against Mr. Waechter).

Can the bar of the statute of limitations be the basis for a judgment against appellant by reason of money which has been in its hands either by cash refund, written authorization or the self-help method employed by it? As to the first two classes it seems clear appellees are seeking to use the statute of limitations affirmatively as a weapon rather than as a shield. It is elemental that this cannot be done (*Greenley v. Lilly,* 155 Kan. 653, 127 P. 2d 416). The rule is amplified in 51 Am. Jur. 2d, Limitation of Actions, § 20, thus:

"A statute of limitations does not confer a right of action, and ordinarily the bar of the statute will not afford a basis for affirmative relief in behalf of one in whose favor the statutory period has run. The sole effect of the statute, as a rule, is to bar the remedy by action, and it does not discharge or pay debts." (p. 604.)

The statute of limitations is simply not available as a cause of action and its bar cannot be the basis of a claim for affirmative relief. As to the two classes mentioned the trial court erred in ruling that appellant was accountable for refunds received.

The question remains of appellant's accountability for its self-help action in making refund deductions from later royalty pay-

ments.  These were all made more than five years after its cause of action accrued and they are within the bar of the statute. K. S. A. 1974 Supp. 60-213 (*d*) provides:

"*Effect of death or limitations.*  When cross demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or cross-claim could have been set up, neither can be deprived of the benefit thereof by the assignment or death of the other or by reason of the statute of limitations if arising out of the contract or transaction set forth in the petition as the foundation of plaintiff's claim or connected with the subject of the action; but the two demands must be deemed compensated so far as they equal each other."

The foregoing statute has been construed to disclose legislative intent to carry over the law as it developed under G. S. 1949, 60-715. Under the old statute it was held that a defendant could assert a counterclaim or setoff, even though barred by the statute of limitations, to the extent of the plaintiff's claim, providing both claims coexisted at some time.  (*Rochester American Ins. Co. v. Cassell Truck Lines*, 195 Kan. 51, 402 P. 2d 782.)  In *Tobin Construction Co. v. Holtzman*, 207 Kan. 525, 485 P. 2d 1276, it was stated:

"The statute, 60-213 (*d*) . . . requires that before the cross-claim can be asserted the two demands, the plaintiff's demand and the defendants' demand, must have coexisted between persons under such circumstances that if one had brought an action against the other, a counterclaim could have been set up.  In all cases this prerequisite requires that at some point in time there must be a coexistence of the two claims together.  If the cross-claim asserted is barred prior to the existence of the claim asserted in the damage action . . ., then the statute does not allow the assertion of the cross-claim, since the two claims at no time coexisted in time."  (p. 534.)

In order to assert a cross-claim under the statutes the two claims must have coexisted at some point in time.  Appellant's claims were barred by the statute of limitations prior to the time it commenced withholding the overpayments from current royalties due appellees.  Appellees' claims are based on the amounts being withheld.  Thus, it would appear appellees' claims never arose until after the appellant's claims were barred and the two claims never coexisted, which renders the statute inapplicable.

In an extensive note entitled "Developments in the Law—Statutes of Limitations", 63 Harv. L. Rev. 1177, the writer says:

"Since the statute of limitations is considered as barring only the direct remedial right of action, and not the underlying claim, the claim may still be of considerable use to its possessor in a variety of situations.  It may be asserted defensively, in an action by the debtor, and even offensively where certain possessory interests are endangered.  Other rights collateral to the

barred claim may still be asserted, and it may be that the remedy of self-help is not affected. But if the time limit is considered 'substantive,' it bars the underlying claim as well, and all remedial rights are extinguished.

"*Defenses.*—Although not independently actionable, a claim may be used to defeat an action brought by the person in whose favor the bar exists, even where the statute of limitations would seem to prohibit the defense. Thus, if the basis of the claim will establish a denial that the plaintiff's cause of action exists at all, the claim may be asserted despite the expiration of the limitations period. Even if the otherwise barred claim is not a defense sufficient to nullify the cause of action, it may be utilized by the defendant if the requirements of common law recoupment are satisfied. . . ." (pp. 1244-1245.)

In *Rochester American Ins. Co. v. Cassell Truck Lines,* supra, it was stated:

"Statutes of limitation are usually considered to be remedial rather than substantive, in that the remedy only and not the right or obligation is barred. . . . [p. 55]

. . . . . . . . . . . . . .

"When considering the effect of the running of the statute of limitations this court is committed to the general doctrine, almost universally recognized by the courts and textwriters, that there is a substantial distinction between a claim asserted as a pure defense and one where affirmative relief is sought. Statutes of limitation are not intended to affect matters asserted strictly in the defense of an action." (p. 56.)

In *Christenson v. Akin,* 183 Kan. 207, 326 P. 2d 313, a vendor sued vendee for the balance due on a written contract of sale of a business. The vendee counterclaimed alleging vendor violated an agreement not to compete. The vendee was held barred by the statute of limitations from obtaining affirmative relief by way of injunction against future competition. However, it was held the alleged violations of contract could be used as a pure defense. The court stated:

"The counterclaim here being considered grew out of the same contract and transaction which is the basis of plaintiffs' cause of action in their petition. Although defendants may be barred from affirmative relief because of limitations, they would seem to have a right to use their counterclaim as a matter of pure defense to reduce any judgment received by plaintiffs herein." (p. 213.)

The vendee was allowed to prove damages but could not recover an affirmative judgment over and above judgment for the vendor. For another example of the use of an outlawed claim as a "pure defense", see *Powers v. Sturgeon,* 190 Kan. 604, 376 P. 2d 904.

Closely akin to the "pure defense" use of an outlawed claim is that of the common law doctrine of recoupment. The subject is

discussed in 20 Am. Jur. 2d, Counterclaim, Recoupment, etc., in the following terms:

"§ 1. Definitions—recoupment.

"Recoupment is the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract. It means a deduction from a money claim whereby cross demands arising out of the same transaction are allowed to compensate one another, the balance only to be recovered.  . . .  [p. 228]

"§ 6.  Nature and scope of remedy—recoupment.

"Recoupment is sometimes spoken of as a rule of strict justice.  . . . The doctrine of recoupment does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of suit by the plaintiff to be examined in all its aspects and a judgment to be rendered that does justice in view of the transaction as a whole.  . . .

"Recoupment exists in equity as well as at common law, and has been said to be equitable in nature. It reduces the claim affirmatively urged so far as in reason and conscience it ought.

"In the absence of a statute to the contrary, recoupment is purely defensive, or in the nature of a common-law defense, and not a separate cause of action or a weapon of offense. It applies only by way of reduction, mitigation, or abatement of damages claimed by the plaintiff.  . . .  [pp. 231-232]

"§ 11.—Recoupment and setoff.

"Recoupment differs from setoff mainly in that the claim must grow out of the identical transaction that furnishes the plaintiff's cause of action and, being in the nature of a claim of right to reduce the amount demanded, can be had only to an extent sufficient to satisfy the plaintiff's claim. In other words, recoupment goes to the justice of the plaintiff's claim, and no affirmative judgment can be had thereon.  . . ."  (pp. 235-236.)

The doctrine of recoupment has found its way into the annals of Kansas law. In *Ruby v. Baker,* 106 Kan. 855, 190 Pac. 6, 10 ALR 1247, Justice Mason quoted approvingly the following:

" 'A defense by way of recoupment denies the validity of the plaintiff's cause of action to so large an amount as he claims. It is not an independent cross claim, like a separate and distinct debt or item of account due from the plaintiff, but is confined to matters arising out of or connected with the contract or transaction which forms the basis of the plaintiff's action. It goes only in abatement or reduction of the plaintiff's claim, and can be used as a substitute for a cross action only to the extent of the plaintiff's demand. No judgment can be obtained by the defendant for any balance in his favor.  . . .' "  (p. 858.)

Appellees' claims here are for the amount withheld by appellant from later royalty payments. They are based on the lease contracts. Appellant's claims for the overpayments grow out of the selfsame

leases. Thus it would appear either under the "pure defense" or the recoupment theory appellant is entitled to offset its outlawed claims against those of appellees so that the parties are left as they were. Does appellant's extra-judicial action make any difference? We think not. Appellant rightfully came into the possession of the entire proceeds of the sale of the gas, including that portion to which the landowners would have been entitled. It cannot be said appellant acquired appellees' money by force, collusion or unfair means, which would present an entirely different picture. The situation is analogous to some of those mentioned in 6 Williston on Contracts, rev. ed., § 2002, wherein it is stated:

"Another consequence of the doctrine that the remedy is barred rather than the obligation discharged is that the creditor remains entitled after the statute has run to use any other means of collecting his debt than a direct right of action. Therefore, any security by way of lien or mortgage may be utilized to collect the claim. Thus, a vendor's lien for the price of land may be enforced, or a mortgage may be foreclosed, or a policy of insurance on the debtor's life, or a pledge of stock, or of any instrument representing an intangible right enforced, though the debt is barred. So the bar of a statute against a principal debtor will not release a surety. And a payment made generally may be appropriated to the payment of a barred debt. An executor may retain from a legacy the amount of a barred debt owing by a legatee to the testator; and generally where the law has not been changed by the construction put upon local statutes, the executor may retain from the estate a barred debt owed to him by the testator, and may pay other barred debts of the testator. The fact that the remedy only is barred, is also thought to be involved in the well-recognized principles concerning the revival of barred debts by subsequent promises." (pp. 5630-5633.)

Appellees' indebtedness was not extinguished by the lapse of time. Appellant has not retained any money to which it was not morally entitled under all the circumstances. The trial court erred in ruling that appellant was accountable for the royalties retained by it.

The judgment is reversed.

APPROVED BY THE COURT.

FATZER, C. J., not participating.

SCHROEDER, J., dissenting: The basic premise underlying the court's decision is that under the oil and gas leases in question the royalty owners are entitled to payment as royalty on gas marketed from each well one-eighth of the *"proceeds"* if sold at the well. This results from the court's interpretation of a gas royalty clause reading:

"Lessee shall pay lessor monthly as royalty on gas marketed from each well one-eight (⅛) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the market value thereof at the well."

By concluding that all of the lessors' one-eighth interest in the gas is sold at the well the court holds the royalty owners are entitled to only the *"proceeds"* of the gas ultimately realized by Amoco Production Company, the appellant.

In my opinion this is an erroneous premise upon which to found a decision in the case at bar for several reasons.

This is a class action by approximately five hundred named landowners, representing a class of some 3,000 landowner-lessors, all in the Kansas Hugoton gas field. The appellant's evidence, "Exhibit D" attached to the Calonkey affidavit, which forms the basis of the trial court's finding No. 40, is unrefuted in the record and discloses that *48 different forms* of gas or oil and gas leases have been dedicated to the fulfillment of the gas purchase contract with Cities Service Gas Company (dated June 23, 1950). These leases contain *numerous variations* in the gas royalty clauses. Among these are leases calling for payment to the royalty owners of "One-fourth of the proceeds of gas sold *at the prevailing market rate*" (emphasis added); "One-eighth of the gross proceeds *at the prevailing market rate* for gas used off the premises." (emphasis added); "One-eighth of the proceeds when the gas is marketed off the leased premises or if not marketed off the leased premises then ⅛ of the *market value at the well."* (emphasis added); and others. The royalty provision seized upon by the court to determine this lawsuit is at variance with these clauses and reads as first above quoted.

Clearly all of the members of the class are not bound by the royalty payment provision used by the court to determine this lawsuit. Neither the trial court nor the appellees regarded the variation in the royalty payment clauses of the many leases to be of major significance, in view of the appellant's conduct through the years, wherein it construed all of the various provisions regarding payment of royalty in the various leases to be the same, and as imposing identical obligations upon it to compensate the royalty owners for their share of the gas produced *at the prevailing market value.* The failure of the court to adopt the appellees' theory, however, does not warrant arbitrary action which penalizes all members of the class whose specific royalty payment clauses require compensation to

the royalty owners on the basis of *the fair market value* of the gas at the well.

Even if it be assumed that all royalty owners in the class are bound by one and the same royalty payment provision, and assuming further that such provision is identical to the royalty payment provision seized upon by the court to determine this lawsuit, the conclusion of the court is not warranted.

In the majority opinion the single word "proceeds" is lifted out of context from the clause and is said to control without regard to any other language in the clause. In other words, the leases in question are construed to be strictly "proceeds" leases. The practical effect of this construction is to tie the royalty owners to payment for their share of the gas produced to the established F. P. C. rate at a given time. This construction of the leases could not have been within the contemplation of the parties when the leases were entered into in 1950 and prior thereto. To ascertain the intention of the parties concerning payment under the royalty clause use of the other words "gas marketed", "market value", "marketed" and "sold" cannot be ignored.

Under the specific terms of the provision used by the court for payment of royalty, when the gas is marketed by the lessee off the leased premises, the lessee is required to pay one-eighth (⅛) *of the market value thereof* at the well. Simply stated this means the royalty owners are entitled to payment as royalty *the market value of one-eighth of the gas produced at the well.* The entire provision discloses an intention by the parties to the lease that one-eighth of the "proceeds" from the sale of gas at the well are to be measured by the market value of the gas produced. If the gas produced is marketed off the leased premises the cost of transporting the share of the royalty owner's gas to the place of sale is deducted to arrive at the fair market value of the gas at the well.

The appellant seeks to avoid its contractual royalty obligations to pay based on the value of the gas sold by asserting the same position it took before the F. P. C. that the lessors herein are only entitled to a "royalty share" of the gas sold. The appellant urges this court to interpret the leases as though they provided for payment of gas royalty in kind. But under the actual lease terms the lessors neither own nor possess any such gas and have no natural gas to sell. There is no such "royalty share" of the gas. It is apparent that something other than payment in kind was intended as to gas royalty.

Fundamentally, the interpretation of contracts requires a determi-

nation of the intention of the parties. (*Springer v. Litsey*, 185 Kan. 531, 535, 345 P. 2d 669.) This intention must be determined as of the time the contract was executed. (*Kittel v. Krause*, 185 Kan. 681, 685, 347 P. 2d 269.) This intention is to be determined from within the four corners of the instrument, absent ambiguity. This intention shall be ascertained by consideration of all pertinent provisions of the contract and not by isolating a single word or phrase. (*Drilling, Inc. v. Warren*, 185 Kan. 29, 34, 340 P. 2d 919.)

Where words or other manifestations of intention bear more than one reasonable meaning, an interpretation is preferred which operates more strongly against the party from whom they proceed. (Restatement of Law, Contracts, § 236 [d], p. 330.) Since one who speaks or writes can, by exactness of expression, more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from the ambiguity of language are resolved against the former in favor of the latter. (*Smith v. Russ*, 184 Kan. 773, 779, 339 P. 2d 286.)

Under Kansas law the construction of oil and gas leases containing ambiguities is in favor of the lessor and against the lessee because the lessee usually provides the lease form, or dictates the terms thereof, and if such lessee is desirous of more complete coverage, the lessee has the opportunity to protect itself by the manner in which it draws the lease. (*Gilmore v. Superior Oil Co.*, 192 Kan. 388, 388 P. 2d 602; see also *Stady v. The Texas Company*, 150 Kan. 420, 94 P. 2d 322.)

The record discloses the appellant has by its conduct through the years, and by argument in its brief, recognized that all of the various lease provisions in question here should be treated the same regarding payment of royalty, and that all of them place identical obligations upon it. At the time the gas purchase contract was executed in 1950, the appellant and Cities Service Gas Company did not anticipate that the Natural Gas Act would be made applicable to the producers of natural gas. On June 23, 1961, the appellant was entitled to a redetermined "fair and reasonable price" from Cities Service with a minimum of 12 cents per Mcf at 16.4 psia. The question was litigated in *Pan American Petroleum Corporation v. Cities Service Gas Co.*, 191 Kan. 511, 382 P. 2d 645. The appellant was there contending the "fair and reasonable price" for the gas sold under the contract for five years commencing June 23, 1961, should be 19 cents per Mcf at 14.65 psia. Cities Service contended it should be 12 cents per Mcf at 16.4 psia. The

Supreme Court upheld the trial court's determination that the new fair and reasonable price for the gas was 14.5 cents per Mcf at 14.65 psia, effective June 23, 1961. In the opinion the court discussed the supervision by the Federal Power Commission over a regulated natural gas company furnishing gas to a distributing company under a long term contract, and said:

"On May 22, 1961, plaintiff filed a Notice of Rate Change with the Federal Power Commission in which it requested the rate under the contract be changed to 12¢ on June 23, 1961, inasmuch as it is the guaranteed minimum specified in the contract. The Notice incorporated the provisions of the contract, recited the pendency of this law suit in Shawnee County, Kansas, and specifically reserved the right to file for any increase in price that might be determined by the Court. On August 4, 1961, the Federal Power Commission entered an order setting aside the former rate and permitting the 12¢ rate to go into effect as of June 24, 1961. The order recognized the pendency of this law suit and specifically permitted the change in rate without prejudice to this litigation. These proceedings before the Federal Power Commission instead of showing a waiver by plaintiff of its right to file for any additional price determined by the Court, preserved that right. The Federal Power Commission thus recognized plaintiff's right to file for any additional price that might be determined by the Court in this case.

"The appellee, on finding it impossible to fix the price by negotiations, could do nothing more than file the minimum rate provided by the contract while it sought the determination of the reasonable price by the court." (p. 521.)

The appellant having taken the position regarding payment of royalty, that the various leases place identical obligations upon it to compensate the royalty owners for their share of the gas produced at the prevailing market rate, cannot successfully argue that they now have "proceeds" leases, instead of "value" leases in which the royalty is based on the market value of the gas at the wellhead, independent of the actual sale price obtained by the appellant.

The appellees contend the royalty obligation was never intended to be measured by a governmentally-imposed rate and that under the pertinent lease provisions it is apparent the yardstick for determining royalty was intended to be that price anticipated from an arm's length sale made by appellant, as a free and willing seller, to free and willing buyers.

A reading of the royalty provision used by the court shows the parties contemplated a disposition of gas by appellant at either the wellhead or at some point off the leased premises. Appellant argues the parties contemplated a different standard of measurement for royalty purposes, depending upon the point at which appellant parted with title to the gas produced. It will be assumed

that this occurred at the wellhead as a result of the appellant's sale of its gathering lines to Cities. See, *Stanolind Oil & Gas Co. v. Cities Service Gas Co.,* 178 Kan. 202, 284 P. 2d 608, where it was stated that the "opinion will not be in the nature of a discussion of any particular legal principle, and that what is said will be of interest only to the parties themselves" in a case to which the appellees herein were not parties.

In both cases (wellhead or off-the-leased-premises sale), the disposition is preceded by reference to "gas *marketed* from each well". What did the parties mean by this quoted phrase? According to Webster's Third New International Dictionary (1961), a market is, "1 a (1) a meeting together of people, at a stated time and place, for the purpose of traffic . . . by private purchase and sale. . . ." Since F. P. C. rate regulation was nonexistent when the lessors executed the leases in question (even as late as 1950, both the lessee and its purchaser, Cities, "did not anticipate that the Natural Gas Act would be made applicable to the producers of natural gas." *Pan American Petroleum Corporation v. Cities Service Gas Co.,* supra, p. 519), it is obvious the parties must have intended disposition of the gas by private and unregulated sale, if the words employed by the parties are given their ordinary meaning.

This conclusion is fortified by an analysis of the language applicable to the marketing of gas at the wellhead and off the leased premises. As to wellhead dispositions, the lessors are to receive, as royalty for gas so *marketed,* one-eighth (⅛) of the proceeds if *sold* at the well. A sale is certainly not the equivalent of an imposed governmentally controlled rate. "A. 'sale' implies willing consent to the bargain. A transaction although in the form of a sale, but under compulsion or duress, is not a sale." (*Dore v. United States,* 97 F. Supp. 239, 242 [Ct. Cl. 1951]).

When the appellant received the proceeds on a regulated per Mcf basis for the gas produced from appellees' lands, it is manifestly contrary to the intention of the parties to say the appellees' royalty should be measured by such proceeds, when they do not constitute the proceeds of *sale,* as that term was used and intended by the parties.

As for gas not marketed at the wellhead, the parties specified "if marketed by lessee off the leased premises, then one-eighth (⅛) of the *market value thereof* at the well." (Emphasis added.) The dominant concept again is the *marketing of gas* to determine the

amount of royalty to be paid. And, despite the fact that marketing of the gas off the leased premises is here contemplated, the yardstick for royalty purposes in such instances is expressly stated as the market value at the well, which makes the place where gas is to be valued identical in both cases.

Conceding that the proceeds permitted to be received or retained by the appellant as a regulated F. P. C. producer, measured on a per Mcf basis, represented less than proceeds receivable under the contract of 1950 or market value of the gas, appellant urges *the contract* or *market values* do not constitute a proper standard for royalty purposes. According to the appellant, language used in the lease must be construed to mean that off-premises disposition of gas entails a market value at the well standard for royalty purposes, while the parties intended something different when they referred to gas marketed through sales technically occurring at the wellhead. If the appellant is correct that F. P. C. rates govern royalty payments where appellant disposes of gas at the well, but such F. P. C. rates do not govern when gas is marketed away from the well, even though royalty is to be measured by the market value of the gas at the well—such a result is wholly incongruous, unreasonable and inconsistent.

In both instances, it was contempated that the gas would be marketed and sold by appellant. Undoubtedly, apart from unforeseen government regulation, it is reasonable to assume when the leases were signed the appellant's duty to market would result in sale prices established at arm's length by appellant as a free and willing seller, which sales prices would approximate the market value of the gas at either location, less a deduction for transportation costs when sales occurred at a point removed from the leased premises. The appellant's *own self-interest* precluded good faith sales at prices less than those obtainable in the prevailing, unregulated market for gas, regardless of where the sale was made. But these obviously anticipated controlling conditions do not govern payments for gas received by appellant when such payments represent the per Mcf proceeds obtained from imposed rates, instead of proceeds received from unfettered sales such as those obviously contemplated when the leases were signed.

The parties obviously intended that the most appropriate place for establishing the per Mcf factor, however it was to be measured, was at the wellhead. *The landowner-lessor could rely on the economic self-interest of the lessee to obtain the maximum sales price*

*for his own benefit.* The term "proceeds if sold at the well" would, accordingly, equal the market value at that point.

This is the only interpretation which harmonizes all parts of the entire royalty clause. It also accords with common sense. *It is the construction which is consistent with the uniform per Mcf basis used by lessee in paying royalty under all of the 48 lease forms.*

In other words, sales at market value occurring at the well were dictated by lessee's own self-interest at the time the leases were signed and it was deliberately emphasized that the same market value standard would apply as to sales made off the leased premises.

For the above reasons the owners as a class in this action are entitled to payment on gas marketed from each well one-eighth (⅛) (or one-fourth [¼] in some cases) of the *fair market value of the gas at the well.*

While the court is bound by that interpretation of the Natural Gas Act which restricts the amounts which producers of natural gas may receive upon interstate disposition of their product, *nothing in the federal statutory scheme governing the profits of producers controls the issues here before the court.* Royalty agreements between landowners, such as appellees here, and producers, such as appellant, are not subject to regulation by the F. P. C. under the Natural Gas Act. *Mobil Oil Corporation v. Federal Power Commission,* 463 F. 2d 256 (1972), cert. den. 406 U. S. 976, 32 L. Ed. 2d 676, 92 S. Ct. 2409, 2410, 2413, reh. den. 409 U. S. 902, 34 L. Ed. 2d 166, 93 S. Ct. 103; and see findings Nos. 53, 54, 55 and 56 in the court's opinion. In *Mobil,* the commission took the position that when a landowner executed a "'proceeds'" or "'value'" lease, "'he has contracted to retain an economic interest in interstate sales by the producer,'" and "'has joined the other interest owners in such sales and he has become a seller of natural gas.'" The court, however, held Congress did not give the F. P. C. jurisdiction to take whatever action it might deem appropriate and said:

". . . The FPC is limited by the provision establishing its jurisdiction, and we do not find in that provision, rooted as it is in a sale in interstate commerce, any basis for reaching out to cover the landowner's lease or its royalty payments. We think it too far removed from the interstate sale. . . ." (p. 263.)

Since the advent of federal regulation, the major portion of our nation's supplies of natural gas, including that from the once rich store in the Kansas Hugoton field, has been substantially depleted in the span of a few decades. By prevention of market place de-

termination of the price payable for interstate sales of natural gas, millions of consumers far removed from sources of supply have been able to obtain heretofore seemingly unlimited quantities of natural gas at artifically low cost, while those who purchase in the uncontrolled markets have been paying higher prices as a result of market forces. The soundness of a policy which has hastened the depletion of our natural gas reserves and which has postponed the development of alternative sources of fuel is not a matter appropriate for judicial determination, but, again, nothing in the issues presently before the court requires it to either deliberately further or to hinder a program, the consequences of which are becoming increasingly disastrous for all those consumers who have become dependent upon an artificially cheap and supposedly inexhaustible supply of natural gas. Certainly, compelling facts today might well support a legislative policy which encourages conservation of our remaining gas reserves to the extent that normal market forces would operate to do so. The court is not concerned with these policy considerations. Rather, the fundamental question before the court is whether the parties to the leasing contracts intended, when they were written, to limit the measure of compensation for royalty to whatever rates were federally imposed upon the appellant to limit its profits in connection with its own interstate disposition of gas produced from appellees' land.

The fair market value of the gas at the well was judicially determined in an independent action designed to resolve that issue in *Pan American Petroleum Corporation v. Cities Service Gas Co.*, supra. The district court there determined the fair and reasonable price for gas sold under the contract involved herein for five years commencing June 23, 1961, based on and compared with the price for gas then being paid by other purchasers in the field under similar contracts and conditions, was the sum of 14.5 cents per Mcf at 14.65 psia. That decision and judgment was affirmed by the Kansas Supreme Court on appeal. This is the best and actually the only evidence of market value for the period in question. The finding of the trial court herein based upon such evidence is binding on appeal.

Subsequent to the production of the gas and the purchase of the royalty owners' interest therein by the appellant, the delivery and transportation of the gas in interstate commerce, where it became subject to F. P. C. regulation, does not alter the obligation of the appellant to pay the royalty owners the fair market value for the

gas. (*Craig v. Champlin, Petroleum Company*, 300 F. Supp. 119 [1969].)

The royalty owners' share of the gas was purchased at the well, prior to its becoming subject to F. P. C. price regulation. The function of the F. P. C. under the Natural Gas Act is to permit sales of natural gas in interstate commerce to consumers at rates which it finds to be just and reasonable. The rate making process includes consideration of the interests, not only of the consumers, but also of the investors in order that returns on investments may be sufficient to assure confidence in the financial integrity of the enterprise. The resulting utility rates found acceptable by F. P. C. are not based upon the value of the natural gas produced, but upon the "actual legitimate cost" incurred in production, gathering, transportation and marketing of the natural gas, *including the cost of the royalty owners' share of the gas purchased at the well.* (*Power Comm'n v. Hope Gas Co.*, 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281.) In the early 1960's the F. P. C. began to substitute area rates for company-by-company rate-making. (*Wisconsin v. Fed. Power Comm'n.*, 373 U. S. 294, 10 L. Ed. 2d 357, 83 S. Ct. 1266.)

Appellant contends that royalty payments, by virtue of the lease provisions, must be considered on a different basis than all other "actual legitimate costs", which taken together govern the maximum amount it may receive for its delivery of interstate gas as determined by the F. P. C. While market forces control other costs incurred by the appellant, the royalty clauses, it argues, *subject royalty payments to rate regulation.* According to appellant, *its royalty obligation is limited to payments derived from its allowable rate and consequently, its royalty costs alone must be determined after, not before, its rates are established.*

The F. P. C. regulated rates are designed to prevent overall excess profits to the appellant over and above the regulated return. But it does not follow that effect should not be given to the intention of the parties as to the standard of value to be applied in determining appellant's royalty obligation. Again, it is the duty of the courts to give effect to the intention of contracting parties whenever it is possible to do so. Requiring the appellant to make payment for royalty on the basis of the fair market value of the gas does not place any hardship upon the appellant which cannot be alleviated by the adjustment of its F. P. C. rates to absorb such royalty costs. This court cannot assume the F. P. C. would do otherwise, since royalty payments are one of the appellant's actual costs bearing upon the

determination of its allowable utility rate for the resale of gas to its customers. Presumably, all of the appellant's other costs are determined by market forces, and no reason warrants an exception for its royalty costs.

Had the appellant consistently paid royalty in accordance with the fair market value of the gas at the well, it would have been in a position to include such royalty costs in its F. P. C. rate base, even though the contract proceeds might have been in excess of the amount the appellant could keep or receive, on a per Mcf basis. *But, when appellant ascertained that its allowable F. P. C. rates were less, on a per Mcf basis, than contract prices obtainable, it and other producers undertook to avoid their contractual royalty obligations by urging the subjection of royalty payments to F. P. C. rate regulation.* The appellant succeeded in its efforts before the F. P. C., but did not prevail before the federal courts. Even if the appellant is eventually unable to retroactively recover the full extent of its royalty costs from its pipeline customers (Cities), that will be attributable to appellant's own initial failure to fulfill its royalty obligation in accordance with the provisions *of its lease agreements.*

"The inability of Atlantic to make a gas sales contract with escalation provisions is beside the point. The obligation of Atlantic to pay royalties is fixed and unambiguous. It made the gas sales contract with full knowledge of this obligation and did nothing to protect itself against increases in price. The fact that its purchaser would not agree to pay the market price prevailing at the time of delivery does not destroy the lease obligation. . . ." (*Foster v. Atlantic Refining Company,* 329 F. 2d 485, 489 [5th Cir. 1964].)

When a producer subject to F. P. C. regulation is required to account for royalty on the basis of its fair market value, it is still in the producer's self-interest to account for royalty on such basis in order to include the full royalty cost in its rate base. It is not the function of a court, when called upon to give effect to the intention of parties to a royalty agreement, to rewrite their agreement because one of the parties subsequently was subjected to governmental regulation which does not extend to their contract.

"It is elemental contract law that since the lessor is not a party to the gas purchase contract entered into between lessee and a third party, he is not bound by the terms of same, if they are in conflict with lessee's obligation under the lease. . . ." (*Texas Oil & Gas Corporation v. Vela,* 405 S. W. 2d 68, 74 [Tex. 1966].)

Appellant, in its reliance on the isolated lease term "proceeds", seeks to obscure the distinction crucial to a resolution of this case. Two concepts must be distinguished. The *contract price* of natural

gas must be distinguished from the *regulated rate,* stated on a per Mcf basis, to arrive at the amount of money it may receive or retain to prevent excessive profits, considering its overall operations. The appellees' judgment in the lower court is based upon the contract price. The appellant's appeal is based upon the federally regulated F. P. C. rates.

Here the appellant did not pursue an ultimate determination by the F. P. C. It compromised by settling the dispute, accepting a 12.5 cent rate which the F. P. C. approved. It must be conceded the appellant had the right and authority to compromise with Cities Service Gas Company and seek F. P. C. approval insofar as it affected its own interests, but it was not authorized to bind the royalty owners to the F. P. C. rate. (See *F. P. C. v. Sierra Pacific Power Co.,* 350 U. S. 348, 100 L. Ed. 388, 76 S. Ct. 368.) The reduced rate was not imposed unilaterally by the F. P. C. upon the parties. Rather, it was the rate sought by the appellant in conjunction with a "package" deal which the appellant submitted to the F. P. C. for approval. The record discloses a settlement proposal which indicates the underlying assumption, wherein the lessors relied upon the economic self-interest of the lessee to secure marketing arrangements to their mutual advantage, no longer obtains.

Here the appellees' claims are based solely upon the contractual rights secured to them by their oil and gas leases.

References in *Pan American Petroleum Corporation v. Cities Service Gas Co.,* supra, pp. 519, 520, to the effect that the 14.5 cent contract price "cannot be made retroactive and form the basis of a money judgment for past sales" and that under the Natural Gas Act the contract provisions that any new price shall be retroactive is "void and unenforceable" must be understood in the light of the above discussion of the *Mobil* doctrine under which the contract price, as distinguished from the per Mcf filed rates, continued in effect as the contract price, with lessee being paid on a given date the contract price and at other rates lower than the contract price because of the differing way in which F. P. C. regulation was imposed.

Accordingly, the royalty owners are entitled for gas taken during the period of June 23, 1961, to June 22, 1966, to collect the fair and reasonable value of 14.5 cents per Mcf at 14.65 psia instead of the lower price paid by the appellant to them.

In my opinion the trial court correctly determined the appellant

on or subsequent to February 15, 1963, had no legally enforceable claim against the lessors for a refund of royalty paid by the appellant for production of gas during the period January 1, 1954, through December 22, 1957, pursuant to K. C. C.'s eleven cent minimum price order.

Under the oil and gas leases in question the lessors have absolutely no say as to when, where, or how deep the wells are drilled, nor the size of the hole or pipeline, when or how much gas is produced, to whom it is sold, the price for which it is sold, the duration of the contract under which it is sold, where it is transported, and how it is to be used. The trial court in conclusion No. 13 stated:

". . . Since lessees have the exclusive control of these matters surely this creates a relationship to lessors which requires the utmost good faith by the lessees in all their dealings as to such gas because of the lessees' opportunities, as a result of such exclusive controls, to take an unfair advantage of the lessors."

The trial court continued in conclusion No. 13 to declare the appellant's duties under these circumstances were equivalent to the imposition of fiduciary duties.

Although the imposition of fiduciary duties upon the lessee under these circumstances does not find support in American authorities, the court in its opinion says:

". . . It seems well established that a lessee under an oil and gas lease is not a fiduciary to his lessor; his duty is to act honestly and fairly under a contractual relationship (*Bunger v. Rogers*, 188 Okla. 620, 112 P. 2d 361). . . ."

This statement is too broad and does not conform to either the Oklahoma or the Kansas law. The *Bunger* case summarily disposed of the matter before it. There the court only had to decide that there was no fiduciary obligation imposed upon the lessees under an oil and gas lease to hold the action barred by the statute of limitations and "laches".

Under both Oklahoma and Kansas law an implied duty or obligation is imposed upon the lessee to exercise the diligence of a prudent operator, having due regard for the interests of both the lessor and the lessee, to obtain a market for the gas at the best price obtainable. (*Gazin v. Pan American Petroleum Corporation*, 367 P. 2d 1010 [Okla. 1962]; *Townsend v. Creekmore-Rooney Co.*, 358 P. 2d 1103 [Okla. 1960]; *Harding v. Cameron*, 220 F. Supp.

466 [1963]; and *Craig v. Champlin Petroleum Company,* 300 F. Supp. 119 [1969].)

In *Gilmore v. Superior Oil Co.,* 192 Kan. 388, 388 P. 2d 602 this court held the duty to market gas rests constantly upon the lessee who is under an implied obligation to exercise reasonable diligence in marketing the gas produced. If a market value for the gas produced does not actually exist, the basis of the reasonable value thereof may be established by competent evidence.

The inescapable conclusion in the instant case is that the appellant acted in a dual capacity, as both buyer and seller of the gas at the wellhead, (*Stanolind Oil and Gas Co. v. Cities Service Gas Co.,* 181 Kan. 526, 313 P. 2d 279), when it dedicated all of the gas or oil and gas leases it had in the Hugoton field to the fulfillment of the gas purchase contract with Cities Service Gas Company on June 23, 1950. Under the circumstances, the appellant was obligated to exercise the diligence of a prudent operator, having due regard for the interests of the lessors to obtain the fair market value for the gas. If the best price obtainable in the open market is established by the sale of gas in intrastate commerce than the appellant was obligated under the leases to pay the lessors the fair market value of the gas so established at the wellhead.

The regulatory body in Kansas was the Kansas Corporation Commission which for the period of time in question had fixed the price at eleven cents. This sum was paid by the appellant to the appellees under its *contractual obligation to do so.* Subsequent efforts by the appellant to recover, what it conceived to be overpayments to the appellees, including self-help without notice to some of the appellees, falls short of good faith and fair dealing in the exercise of reasonable diligence for and on behalf of the appellees. Under these circumstances the trial court came to the correct conclusion and its judgment should prevail.

In my opinion a dangerous precedent is established by the court's decision construing the royalty clauses of the leases here in question to be "proceeds" leases. Damages to the landowners of the state, who have executed similar leases, will be irreparable. Giant corporations of national and international scope operating in the oil and gas industry, with the ingenuity of counsel available to them, can operate through parent and wholly-owned subsidiary corporations to completely defeat the rights of the lessors to the fair market value of their royalty interest in the gas produced.

A good illustration of a parent company and a wholly-owned subsidiary company, indicating the magnitude of their close dealings, is *Power Comm'n v. Hope Gas Co.*, 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281, where the Hope Natural Gas Company is a wholly-owned subsidiary of Standard Oil Company of New Jersey.

The impossibility of identifying the controlling corporation in many instances, coupled with the possibilities sanctioned by the court in *Cline v. Angle*, 216 Kan. 328, 532 P. 2d 1093, wherein a circuitous sale from the lessor-producer Angle to Kansas-Nebraska, and a sale back to Angle as purchaser-processor of the gas, was permitted to defeat the clear provisions of a paragraph in a lease assignment agreement upon which the parties had negotiated and reached agreement, foretells oil and gas lessors in the State of Kansas of "handwriting on the wall."

It is respectfully submitted the judgment of the lower court should be affirmed.

KAUL, J., joins the foregoing dissenting opinion.